JoNes, Chief Judge,
dissenting, in which LittletoN, Judge (Ret.) joins:
We are unable to agree that the substantial purpose of the League was “carrying on propaganda or otherwise attempting to influence legislation.” Rather, we think its primary or almost exclusive purpose was that of enabling women to •capably discharge the duties that the new voting privilege had placed upon them.
*569 It is to their lasting credit that they did not take their new obligation lightly, but sought to prepare themselves to discharge this trust intelligently.
We believe the majority opinion fails to recognize the vast difference between attempting to promote general policies and principles of government that may be implemented by legislation or by other practices and customs that will inure to the benefit of all citizens and tend to promote sound government; and the drive or lobbying for legislation that has for its purpose the serving of the interests of a limited or selfish group. The one may or may not result in legislation. It may be a drive for a treaty, or it may be merely evidenced by a change in the habits, customs, and thoughts of a people, while the other has no such over-all objective, but seeks to secure certain privileges for a limited group. We have not the slightest doubt it was the latter type which the Congress sought to put under the ban, and not those who seek to promote the principles of good government, and who seek no advantage to themselves that will not flow to all citizens.
Nearly all the legislation passed by the Congress recognizes this distinction. This is illustrated by antilobbying legislation.
Lobbying is defined in Black’s Law Dictionary, 4th edition, page 1086, as follows:
“Lobbying” is defined to be any personal solicitation of a member of a legislative body during a session thereof, by private interview, or letter or message, or other means and appliances not addressed solely to the judgment, to favor or oppose, or to vote for or against, any bill, resolution, report, or claim pending, or to be introduced by either branch thereof, by any person who misrepresents the nature of his interest in the matter to such member, or who is employed for a consideration by a person or corporation interested in the passage or defeat of such bill, resolution, report, or claim, for the purpose of procuring the passage or defeat thereof. But this does not include such services as drafting petitions, bills, or resolutions, attending to the taking of testimony, collecting facts, preparing arguments and memorials, and submitting them orally or in writing to a committee or member of the legislature, and other *570 services of like character, intended to reach the reason of legislators.
Practically all the restraining legislation in matters of this kind has to do with representatives or concerns who are seeking to influence the passage of legislation that will be of direct financial interest to themselves or to the concern or association which they represent. Apparently there has never been any thought of restraining or limiting the activities of any organization that has for its primary purpose the dissemination of information that they believe will inure to the benefit of all of the people of the Nation.
An enlightened citizenship is the only hope of a free government. No country that is steeped in ignoran'ce can either become or remain free. How can people retain their rights if they do not understand them? That requires continuous effort. Otherwise the country will sink back to dictatorship and despotism and individual rights will be lost.
Human freedom has involved a long struggle. Through despotisms, aristocracies and dictatorships, ambitious individuals and groups have sought to restrict the rights of men. Wars have been fought and maaiy men and women have lost their lives in the struggle upward toward the plains of liberty. These wars have cost seas of blood, broken hearts, and billions of treasure. Our forefathers wrung from the hands of a foreign tyranny the unhindered right to be free.
But it is not enough to win liberty. It must be maintained by “eternal vigilance;” otherwise it will be lost. The only way a free people may remain free is through the exercise of the ballot — and then only if it is intelligently exercised. We grow used to the precious things of life and take them for granted. With all our boasted progress, not much more than half our citizens exercise the privilege of the franchise. Much needs to be done in arousing the interest of citizens in perpetuating the principles of free government and in protecting our heritage. Few organizations in our land have made it their primary business to arouse interest in voting and through research and open discussion promote not only the exercise of the ballot but its use in an understanding manner.
*571 We cannot believe it was the intention of the Congress to deny an exemption to an otherwise qualifying organization merely because it seeks in some instances, in a wholly unselfish manner, to translate principles of government into the form of legislation, when the organization will derive no special benefit from that legislation. The language does not require it, and certainly the interests of the Nation would not be served if this organization should cease to take an interest in public affairs.
One of our great universities prints on the flyleaf of its annual catalogue these words
A cultivated mind is the guardian genius of Democracy. It is the only dictator that freemen acknowledge, and the only security which freemen desire.
To have an organized force with 700 local chapters in every part of this broad, big country that is devoted to stimulating an interest in the problems of government is a distinct national asset.
In our system of government worth-while policies grow out of the customs and habits of the people in the various communities that make up our country. As a rule men do not make laws. They merely discover them. When in the course of progress the customs and habits of a people and sometimes their methods of doing business change, the wise legislator crystallizes these changes into law so that the conduct of all may be brought into line with the wishes of the majority, subject always to the limitation of our Constitution and Bill of Bights. This is the essence of free government.
The operations of plaintiff organization follow this pattern completely. Its activities, ideals, and moral fibre grow out of the local chapters and local communities. It is like the limbs and roots of a tree. Without the life-giving flow of strength and vitality from these local chapters, the trunk of the tree would be nothing but dried up sap — and as such would wither and die.
Several cases have been decided in which local or State leagues have been held exempt. Liberty Nat. Bank & Trust *572 Co. v. United States, 122 F. Supp. 759 (W. D. Ky. 1954), in wbicb a number of cases are cited.[1]
The majority draws a distinction between the local chapters and the national organization, but as a matter of fact they are as intimately linked as the law of supply and demand ; they are part and parcel of each other. The central organization is but the national arm of the local chapters. It is the channel or clearing house through which the local chapters receive information as to the pros and cons of principles and policies of government and to which they may after discussion convey their position. This information may be again referred to and exchanged with other local chapters before the position or wish of the various chapters is finally determined. The record shows that more than 90 percent of the time of local chapters is taken up with matters of local and community interest. The record does not disclose a single one of the organizations — local, state, or national — seeking to influence legislation that would be of peculiar financial benefit to themselves.
Even if it were determined that the efforts of the organization to influence legislation were of the type intended to be put under the ban, our findings presented by the trial commissioner who saw the witnesses face to face and who went through the record, and whose findings we have adopted, rather clearly show that the legislative activities were not a substantial part of the League’s activities. The *573 seven primary activities of tbe organization are set out in findings 22 and 23, and in summarizing tbe hours spent in various types of activity the following percentage is shown:

Hours Percentage of Total

Organization_ 65, 758 46.28
Finance- 14,888 10.14
Administration_ 19,150 13.50
Public Relations_ 11,092 7.82
Program_ 28, 255 19. 92!
Voters Service_ 2,468 1.74
Legislative- 737 .52
Total_141, 843 [1]99.92

Honrs Percentage of Total

Program_ 28,255 90
Voters Service. 2,468 8
Legislative-737 2
Total_ 31,460 100
Subsequent findings show the amount of activities of the various local and state chapters and the percentage of time and effort devoted to legislation. The various activities of the League are disclosed in detail in the findings.
We are unable to escape the conclusion that the League of Women Voters is a completely unselfish organization operating almost exclusively in the public interest. It is clearly not the type of organization which the Congress meant to exclude from the benefits of the tax-exemption section. The activities of the League are in no sense partisan. It is almost wholly educational in its nature. It undertakes to present both sides of every issue to its various integral branch organizations, does not undertake to prejudice the issue but undertakes to reflect the sentiment of the various local bodies which have been reached after thorough consideration and discussion. A very small part of the activities of the organization as a whole is devoted to influencing legislation and none at all to influencing legislation that would inure solely to the benefit of the national organization and its integral chapters.
*574 We would hold that the activities of the organization as a whole bring it within the exemption clauses of section .812(d) of the Internal Revenue Code of 1939, and that the plaintiff therefore is entitled to recover.
FINDINGS OF FACT
The court, having considered the evidence, the report of trial commissioner S. R. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Ann Webster, a resident of the State of New Mexico, died on November 2,1949. The sole residuary legatee under her last will and testament was the League of Women Voters of the United States, the plaintiff herein (sometimes hereinafter referred to as the “National League” or the “League”). The total gross estate as reported for Federal estate tax purposes amounted to $142,014.22. The remainder bequeathed to the League amounted to $112,269.89. The estate was required to pay, and on July 1, 1952, did pay, a Federal estate tax of $11,913.70. The amount of the tax paid was based on the value of the net estate, without allowing a deduction for the $112,269.89 bequeathed to the League.
2. The tax was paid out of the remainder of the estate. Had the bequest to the League been allowed as a deduction for estate tax purposes under section 812(d) of the Internal Revenue Code of 1939, no estate tax would have been due. Said section provides in pertinent part as follows:
For the purpose of the tax the value of the net estate shall be determined, in the case of a citizen or resident of the United States by deducting from the value of the gross estate—
* # H* * *
(d) The amount of all bequests, legacies, devises, or transfers * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * *.
*575 3. All tlie assets of the estate have been distributed, the executors have been discharged, and no administrator de bonis non has been appointed. Plaintiff is the sole residuary legatee of the estate and if the estate tax was erroneously paid, is entitled to the refund of the amount paid, with interest thereon.
4. Plaintiff filed a timely claim for a refund of the estate tax on September 13, 1954, on the ground that the tax was erroneously collected. No refund was made and the petition herein was timely filed on May 29, 1956.
5. Plaintiff is a nonprofit organization. It was projected at the 1919 Convention of the National American Woman Suffrage Association and held its first convention in 1920. Originally, it was an affiliation of state leagues following the pattern of the Suffrage Association. It was incorporated on September 23,1923, under the laws of the District of Columbia authorizing the formation of nonprofit, charitable, educational, or religious corporations. It maintains its principal office in Washington, D.C.
6. (a) Plaintiff’s purpose and objects are described in its articles of incorporation, as follows:
The business and objects of the corporation shall be to promote political responsibility through informed and active participation of citizens in government; to render such other services in the interest of education in citizenship as may be possible; and to do every act appropriate or necessary to carry out any of the foregoing objects. The corporation shall not support or oppose any political party or candidate.
(b) Its By-Laws, as constituted on April 30, 1948, provided :
ARTICLE n

Purpose and Policy

Sec. 1. Purpose. — The purpose of the League of Women Voters of the United States shall be to promote political responsibility through informed and active participation of citizens in government.
Sec. 2. Policy. — The League may take action on governmental measures and policies in the public interest. It shall not support or oppose any political party or candidate.
*576 7. (a) Any person who subscribes to the purpose and policy of the League is eligible for membership. Members of the League are organized into local leagues in communities within the various states, article IY, section 1 of said by-laws providing: “Members shall be organized into local Leagues in order to promote the purpose of the League of Women Voters of the United States.” The local leagues are also organized into state leagues, which are composed of all recognized local leagues within the state, article V, section 1 of said by-laws providing: “Local Leagues shall be organized into state Leagues in order to take action on state governmental matters and in order to promote the work of the League of Women Voters as a whole.” Members at large are women who reside outside the area of a local league. As of March 31, 1950, there were 709 active local leagues and 35 state leagues. As of the date of the trial of this case, i.e., March 31, 1958, there were 1,028 active local leagues in 48 states, the District of Columbia, Hawaii and Alaska, with a total membership of approximately 128,000.
(b) Other categories of leagues are as follows: (1) College leagues are organizations of women in colleges who subscribe to the purpose and policies of the League. (2) Provisional leagues are groups of women in communities in which no local league exists, who wish to form a league. They may be organized and recognized as provisional leagues by the state league until such time as they meet the recognition standards of the National League for local leagues. When a provisional league meets such standards, the board of directors of the state league recommends that recognition be granted. Final action on recognition rests with the board of directors of the National League.
8. (a) Annual dues of $3.00 are payable by all members of the state league in the community in which they reside. If no local league has been recognized in such community, the members pay annual dues of $2.00, $3.00 or $5.00 to the state treasurer, the amount varying in different states.
(b) The fiscal year of the National League commences on the first day of April in each year.
9. Only one local league in each community is recognized by the National League. Each local league is an integral *577 part of the National League and of the state league of the state in which it is located. The National League requires each local league to act only in conformity with the position taken by the National League. If a local league does not abide by the conditions of conduct set up by the National League, the local league may be disaffiliated.
10. Throughout the years, the League has developed a program system which is designed to narrow the number of problems to be currently studied or acted upon by the League. The League’s “program” is composed of two parts, (a) the “Current Agenda” and (b) the “Platform.” The program is authorized by the League’s biennial national Convention pursuant to a provision of article XI, section 5 of said bylaws reading: “The Convention shall consider and authorize for action a program * * Article XIII of the by-laws entitled “Program” provides for the Platform and Current Agenda as follows:
Sec. 1. The Platform. — The Platform shall represent positions taken by the League as a whole in fields of government to which it has given sustained attention.
* * ❖ * *
Sec. 2. Current Agenda. — The Current Agenda shall be limited to such governmental issues as the Convention shall choose for concerted action.
* * * * *
11. (a) The method by which the League program is formulated is described in an official League publication, entitled “Program 1948-1950”, as follows:
MAKING THE LEAGUE PROGRAM
The current agenda and the plateorm make up the League’s program of work. League members and their representatives make the program. This process begins early in the fall preceding the Convention. First the members discuss the kind of program needed, and the local League makes its recommendations to the national Board, sending a copy to their state Board. State Boards also submit recommendations to the national Board, which meets in November and works out a “Proposed Program.” This is submitted to the Leagues in ample time for the consideration of all members, and local and state Leagues may again submit recommendations. The national Board, in the light of six months’ *578 discussion wbicb bas gone on throughout the whole League, then proposes a program to the Convention. Any of the recommendations which have been submitted but not included in the proposal to the Convention may still be considered on the floor of the Convention, although they require a two-thirds vote to be adopted.
Through this careful, representative, democratic process, the League of Women Voters determines its programs. The CURRENT AGENDA includes only those subjects on which the League as a whole believes it can be effective in the next two years. This means that only, questions of fundamental importance are selected ana that energies are concentrated. The objective is to select only as many items as can be well and thoroughly supported by League members.
The League exists to help its members and other citizens assume political responsibility with intelligence and conviction. League action is political action, but it is political action in the public interest, in support of selected issues, not candidates. It is nonpartisan. Individual members are, of course, free to arrive at conclusions different from those of the League as a whole and to act on them as individuals outside the League.
By arriving at decisions by a majority vote of the members or their representatives, and by being assured of a loyal minority which understands the process, the League does two things: it helps its members to become responsible members of the political life of their community, state, and nation and it helps in the accomplishment of worth-while, progressive objectives for government.
(b) The development of the League’s program system is described in an official League publication entitled “A History of the League Program”, published in 1949, as follows:
For twenty-two years the League built upon one program — adding new items, re-writing old ones, and occasionally dropping an item. The program as voted by the national Convention was the framework for all League work, with state and local Leagues selecting from the items appropriate to their levels of government. Gradually, the program became long and cumbersome. It became desirable to distinguish between the things the League had stood for and had worked upon and those items which were to be the current job. From 1934 to 1942 this was done by designating certain items for “emphasis.” In 1942 the Convention embodied *579 past League experience in The Platform, which represents positions taken by the League as a whole in fields of government to which it has given sustained attention.
From the Platform the state and local Leagues now take their guidance for work on state and local governmental measures and policies. From the Platform the national Board may select measures for action if an opportunity arises to do work on a measure which is in conformity with the Platform. Since 1942 the League’s current program of work has been treated separately from the Platform. The Current Agenda, as it now is called, is made up of those items selected by the Convention for intensive and concerted League work during a given two-year period.
12. (a) Tire Current Agenda of the National League for the two-year period, 1948-1950, was adopted at the national biennial Convention in Grand Bapids, Michigan, in April 1948. The League’s official publication, referred to in finding 11(a), set forth and explained the Current Agenda as follows:
PROGRAM 1948-1950
The League of Women Voters, believing in the dignity of the individual, and that freedom and prosperity can be stably maintained within our democratic society, works unremittingly to promote political responsibility through informed and active participation of citizens in government, to the end “that government of the people, by the people and for the people shall not perish from the earth.”
The Current Agenda is made up of those governmental issues which the Con/oention has chosen for concerted action. Action may include (1) providing information, {%) building public opinion, 0) supporting legislation. It is the responsibility of the national Board of Directors to supply the membership with basic information on these items and to determine at a specific time the action that will be most effective in achieving the following goals:
CURRENT AGENDA
The League of Women Voters will work for United States policies directed toward an enduring world peace, supported by a strong United Nations and made possible by a sound domestic and world economy. To this end, League action will concentrate on:
*580 I. Strengthening the United, Nations through—
A. Support of the United Nations and its specialized agencies including their development through increased use, adequate budgets, and improved procedures under the present Charter.
B. Use of all means available under the Charter to increase the security functions of the United Nations.
C. A full information program on methods to strengthen the United Nations in order that it may better fulfill its stated purpose.

II. Promoting international reconstruction and the expansion o f world trade.

III. Analysing federal taxes and expenditures in order to wnderstamd and support such fiscal policies as rnaike for a stable domestic economy.

EXPLANATION OF THE CURRENT AGENDA

I. Strengthening the United Nations

“Through the program we have adopted, we are determined to build faith and hope to undergird the United Nations, to the end that nations may have time to learn to live together in peace.” This statement of the Convention sums up the thinking of the League delegate body in deciding upon the Program for 1948-50.
The League of Women Voters recognizes in the United Nations the most comprehensive system for international cooperation the world has yet achieved. The League will work to see that the full potentialities of the United Nations are understood by the public and used by our government. While well aware of the difficulties that have so far limited its effectiveness, the League believes that the United Nations provides the best foundation on which all nations can work toward peace. The possibilities of strengthening this foundation and of building on it are limited only by the willingness of the member nations to do so.
The League will continue to urge, as it has in the past, that the United States do its full part in developing a strong United Nations. An important contribution toward this goal is a realistic appraisal by United States citizens of the Charter and the United Nations record to date. Citizen action must be based on a solid understanding of what the United Nations can and cannot do, of what it has and has not accomplished. Such understanding seems dangerously lacking in the United States today.
*581 League action toward strengthening the United Nations will concentrate in three fields:
A. Support of the United Nations and its specialized agencies, including their development through increased use, adequate budgets, and improved procedures wider the present Charter.
The League has from the first urged the creation of sound machinery for the United Nations. Now that the basic structure of the United Nations is nearly complete, the League’s interest centers on seeing that full and effective use is made of its organs and specialized agencies. The League may support such measures as the creation of additional machinery for settling disputes, the use of the Little Assembly, proposals for modification of the veto, further development of international law, and United States ratification of various international conventions.
B. Use of all means available wider the Charter to increase the security functions of the United Nations.
Because the security functions of the United Nations are vital to its existence, the League of Women Voters will explore all means possible to increase collective security within the United Nations system. Basic to world security are the provision of armed forces to the United Nations, the regulations of armaments, and international control of atomic energy and other weapons of mass destruction. Failure to make progress in these three key fields has dangerously weakened the United Nations. The League of Women Voters will continue to support action by the United States government toward fulfilling these major security provisions of the Charter.
Pending the implementation of the major provisions, other steps toward international security are possible under the Charter. Joint action for self-defense is permitted under article 51, in case the Security Council fails to act. There are further possibilities in the development of regional arrangements — economic, political and military. The League will follow closely the growing trend toward regional integration, as seen in the Pan-American system and the progress toward a European Union. The League will weigh, with a view to supporting, action which the United States might take to strengthen collective security through such special arrangements within the framework of the United Nations.
The League will keep to the fore the principle that a universal security system under the United Nations is *582 still the primary and urgent objective; regional arrangements, or collective agreements under article 51, should be subordinate to this objective and integrated into a universal system once it is established.

G. A full information program on methods to strengthen the United Nations in order that it may better fulfill its stated purpose.

A major part of League action in the coming two years will be devoted to one fundamental job: building a sound understanding of the United Nations, among League members and throughout their communities. This job— “Know Your United Nations”- — is basic to intelligent support of the United Nations and to appraisal of United States policies.
We should come to consider the United Nations as a fourth level of government which is in the process of evolving. We must become as familiar with its functioning as we are with that of our local, state and federal governments.
The League will examine possible methods of strengthening the United Nations within the framework of the present Charter, as well as constructive proposals for creating a stronger world authority than the Charter now provides.

II. Promoting international reconstruction and the expansion of world trade.

Recognizing that economic foundations of the peace are among the most important, the League of Women Voters has for many years supported measures leading toward a healthy world economy The League will continue to support such measures in the coming two years when, more than ever, constructive United States leadership is essential.
Three key issues which are closely interrelated will demand intensive League action:

European Reconstruction

The League supports the European Recovery Program as a necessary step in building a peaceful world. The Program needs continued watchfulness, sustained public support, and constructive criticism if its principles are to be safeguarded and its tremendous task fulfilled. Annual authorizations and appropriations will be required. The League favors the use of United Nations machinery in carrying out the program wherever feasible.

*583
International Trade Organization

The League supports the creation of an International Trade Organization as an integral part of the economic machinery of the United Nations. The success of the Organization will depend to a large degree upon United States support. The first step required is Congressional approval of United States participation in the International Trade Organization.

Reciprocal Trade

The League reaffirms its long-standing support of the Eeciprocal Trade Agreements Act as a means of reducing barriers to world trade. The Act is especially needed at this time, if the United States is to put its full strength behind the International Trade Organization, and is to carry out the principle of expanding world trade which is part of the Economic Cooperation Act.

III. Analysis of federal taxes and expenditures in order to understand and support such fiscal policies as malee for a stable domestic economy.

Minimizing business fluctuations is the most important economic problem facing us today. Every citizen is concerned with the rising cost of living; he will be even more disturbed about the inevitable reaction, depression and unemployment, which will bring far greater hardship.
Business fluctuations in the U.S. have important repercussions on international policies. Our European aid program suffers from the rising cost of American goods. Our attempts to reduce trade barriers have been seriously hampered by the unwillingness of other countries to expose themselves to our depressions.
The present size of the federal budget makes it a key factor in the control of business fluctuations. The use of federal expenditures and taxes to reduce inflation and deflation probably is more effective, and interferes less with the free market, than price controls and rationing. The League has therefore singled out for concentrated analysis the types of expenditures made by the federal government, the relative proportions of those expenditures, and the methods by which money is obtained to pay for them. The League does not plan to make a comprehensive study of the details of federal expenditures and taxes, but will confine its work to their general effect on the economy.
The League has long favored the adoption of an equitable and coordinated system of federal, state, and local taxation. League members have worked on tax *584 and expenditure problems in state and local governments for many years. They will now extend their study to the entire system of government finance.
Since it is entirely within the realm of government, this subject is peculiarly suited to League action. Proper functioning of the federal budget will not alone bring about a stable economy. The League believes, however, that by concentrating its efforts on this key item, more will be accomplished than by scattering our attention over many items. This is a relatively new field of League work, and action will, for the first year, be limited to providing information and building public opinion.
(b) The aforesaid publication also set forth the League’s Platform for said period, as follows:
THE PLATFORM
The Platform represents positions taken by the League as a whole in fields of government to which it has given sustained attention.
The national Board may select measures for action from the Platform if an opportunity arises to do work on a measure which is in conformity with the Platform.
The principles stated below are the authority under which state and local Leagues adopt Current Agenda on state and local governmental measures and policies.

I.Government by the people requires:

A. The protection of the citizen in his constitutional rights, especially those of freedom of speech, religion, assembly, and press.
B. Removal of legal and administrative discrimina-tions against women. Protection of minority groups against discrimination.
C. A system of free public education with equal opportunity for all and adequate protection for academic freedom.
D. Legal protection of all citizens in their right to vote.
In promoting these principles the League has supported the following measures and policies:
1. The extension of suffrage to the District of Columbia.
2. Abolition of the poll tax as a prerequisite to voting.
3. Registration systems designed to facilitate voting and protect against fraud.
*585 4. Specific legislation designed to insure for women equal guardianship, jury service, independent citizenship. Opposition to the equal rights amendment.
5. Federal aid to equalize opportunities for public education, such grants to be administered by State departments of education.

II. Government of the people requires:

A. A system of government in which responsibility is clearly fixed.
B. A system of government which is responsive to the will of the people and which enables the voter to carry out his obligation as a citizen.
C. A system of government which constantly seeks to operate more efficiently.
In promoting these principles the League has supported the following measures and policies:
1. The short ballot.
2. Council manager local government.
8. Modernization of state constitutions.
4. Administrative and legislative reorganization.
5. The principle of the executive budget.
6. Improved methods of selecting and retaining qualified personnel.
7. Use of research and scientific methods in all fields of government.
8. Adequate appropriations to support public services.
9. Adoption of an equitable and co-ordinated system of federal, state, and local taxation.
10. Development of state and local tax and administrative units, large enough for efficiency and economy.
11. Coordination between federal, state, and local governments for public health and welfare.
12. A constitutional amendment changing the procedure for the approval of treaties to a majority vote of those present and voting in both houses.
13. Strengthening the organization and procedures of the Congress.

III. Government for the people requires:

A. The assumption of responsibility by government for social problems which affect the general welfare.
B. Mutual responsibility of government, business, agriculture, and labor for solving economic problems in the public interest.
C. Conservation and development of natural resources in the public interest.
In promoting these principles the League has supported the following measures and policies:
*586 1. Control of child labor, social security measures for children, protection of dependent, delinquent, and neglected children.
2. Old age and unemployment insurance, provisions for relief and old age assistance. Extension of coverage for the social insurance program.
3. A housing program based on sound community planning. Slum clearance and public subsidized housing for low income groups.
4. The right to bargain collectively, maximum hour and minimum wage standards, a federal-state system of public employment offices.
5. Protection of the buying public by establishing standards of purity and quality, adequate information, and fair trade practices.
6. Opposition to interstate trade barriers.
7. Equal employment opportunities for members of minority groups.
8. Equal pay for equal work.
9. Civilian control of atomic energy in the public interest.
10. Anti-inflation controls in time of national emergency.

IV. That such government shall not perish from the earth requires:

A. Recognition of the interdependence of the world.
B. The cooperative method of solving international problems.
C. Adoption of domestic policies which will facilitate the solution of international problems.
In promoting these principles the League has supported the following measures and policies:
_ 1. Membership in a general international organization to include all peoples regardless of race, religion, or political persuasion for peaceful settlement of disputes, with power to prevent or stop aggression.
2. Participation in international agencies to solve common political, economic, and social problems.
3. International agreements for the limitation of armaments.
4. The reduction of trade restrictions.
5. A tariff policy as exemplified by the reciprocal trade agreements program.
6. Opposition to racial discrimination in immigration laws.
13. (a) When the League begins the study of a particular topic, it first attempts to ascertain the facts. As stated in *587 the publication “A History of the League Program”, referred to in finding 11(b) :
* * * A given problem must first of all be realized and its seriousness judged. Then, to do something about it through government, laws must be passed, organizations erected, administrative procedures established. In a democracy this whole process is shaped by the attitudes and actions of the citizens.
It is the citizens who make it possible or impossible in the beginning. Their thinking largely determines the strength and character of governmental measures, and the timing and life of the measures. Citizen watchfulness affects the administration of measures. Citizen cooperation, or the lack of it, determines their success or failure.
The problem with which the League of Women Voters was faced in 1920 was how to make new citizens realize these things, and how to help them undertake their responsibility. How better could this be done than by asking questions, searching with open minds for the answers, and answering them together? Very simply, that is the League process — the League method — a way of asking questions and answering them effectively through the program.
# ‡ * * *
A cardinal principle from the beginning was to search for all relevant facts and make decisions in the light of knowledge. The League reacted against old political habits based upon emotion, prejudice, and narrow self-interest. Members were determined not to accept unthinkingly the attitudes of husband or father. They were determined to rise above the settled economic and political habits of their families and find the answer which was in the public interest.
* * * * *
Only when the League considers that sufficient time has been allowed for careful study are determinations made as to whether any position will be taken. As set forth in an official League publication entitled “Know Your State”, published in May 1947:
One of the most important principles upon which the League of Women Voters operates is that of coming to considered opinions about government — carefully studying all the facets of a problem before taking action — and being jealous of our reputation of always *588 knowing what we are talking about. One of the ways to accomplish this within the League has been for many years the thorough examination of the structure of government at every level. * * *
To aid the members in obtaining a better understanding of their local governments, the League publishes materials such as said “Know Your State” publication, a 35-page pamphlet, a 57-page “Know Your County” pamphlet, and a 35-page “Know Your Town Government” pamphlet.
(b) If, after study, the League concludes that it does not desire to support any change in the current situation, nothing further is done. When the League does take a position and legislation is pending, it will either actively support or oppose the legislation. The League itself, since the early 1920’s, when it did so with regard to child welfare legislation, has neither drafted nor caused to be drafted, any particular bill for introduction to a legislative body. However, in 1946, the League did join with other national women’s organizations and with the Women’s Bureau of the Department of Labor in preparing and arranging for introduction into Congress the so-called “status of women” bill. This proposed legislation, which was offered as an alternative to the proposed Equal Bights Amendment, would (1) declare a national policy against discrimination against women; and (2) establish a presidentially-appointed commission to study and make recommendations on the economic, civic, political and social status of women in the United States. After introduction of the bill, a League representative appeared at a hearing on the bill and made a statement in support of it.
(c) The philosophy behind the League’s taking a position on various issues is also set forth in said publication “A History of the League Program”, referred to in finding 11(b), as follows:
LEAGUE PROGRAM AND LEAGUE PURPOSE
Sometimes the League of Women Voters is referred to as an “educational” organization which presents both sides of issues and leaves it up to the member to make up her mind. This is an incomplete description. Although the League does carefully consider a question from all points of view, it goes farther. It uses its own *589 machinery of representative government to arrive at a position and take action on behalf of that position. This it considers necessary to the fulfillment of its purpose “to promote political responsibility through informed and active participation of citizens in government.” Citizens do not assume responsibility without making decisions. The League was created to provide practice in making decisions.
(d) An official League publication entitled “Let Freedom Bing,” published in 1945, stated as follows with respect to measures supported throughout the years up to that time:
THE MEMBERS ADOPT THE PROGRAM * * *
* * * * *
For 25 years the National League of Women Voters has sailed a progressive course, supporting such measures-as: maternal and child health act; pure food, drug and cosmetic act; various civil service acts; reciprocal trade act; lend-lease; price control and rationing; UNRRA; and the United Nations Charter and Bretton Woods.
14. If the League does take a position on any item, there are three ways in which it may do so: (1) If, during the two-year period between conventions, the national Board believes that the local leagues have arrived at a consensus of opinion, the Board may enunciate a League position. The Board bases such action on information obtained by correspondence, from publications or bulletins issued by the local leagues, and personal visits to the local leagues. (2) In alternate years between conventions, there is a Council meeting. Two representatives from each state sit on the Council. The Council may recommend to the national Board that a position be taken on an item. (3) The biennial convention may take a position. At times, these methods may overlap, as is illustrated in the case of the so-called Bricker Amendment. As this issue developed, the League sent out for over a year a large amount of data both for and against the proposal, including extensive bibliographies. A Council meeting was held at which the national Board sought information as to how the delegates felt about the Amendment. The delegates themselves were overwhelmingly opposed to it. However, they realized that the members of the local leagues were not *590 fully informed and had not sufficiently studied the issue. The delegates returned to their local areas, more study and meetings took place, and thereafter the National League began to receive letters in volume expressing such opposition to the Amendment that the Board felt convinced that the membership was overwhelmingly opposed to it. Accordingly, a position in opposition to the Amendment was taken by the Board on behalf of the League.
15. (a) As set forth in that part of the publication “Program 1948-1950”, quoted in finding 12(a), one phase of “League action” is “supporting legislation” concerning issues on the League’s program. This form of “action” may include the sending of a communication, called a “Bequest for Action”, to the state and local leagues, setting forth the position taken on any pending legislation concerning the item and requesting that each local and state league write letters or telegrams to designated persons setting forth the League’s position. For instance, a “Bequest for Action” was sent on May 17,1949, urging action on five bills and the Atlantic Pact Treaty. Typical was the action urged with respect to the item “Bemoval of Margarine Taxes (PI.B. 2023) ”, as follows:
Already passed by the House and favorably reported by the Senate Committee, this measure runs the risk of being lost again in the rush of Senate business. Letters should go now to all Senators (and especially to Democratic leaders Barkley, Lucas and Myers) urging them (1) to do all they can to bring this bill to the Senate floor before the summer recess, and (2) to oppose the Wiley amendment which would prohibit the interstate shipment of colored oleo.
Communications are also sent advising the local leagues concerning positions taken, such as the letter dated May 2,1949, stating:
This letter brings you word that the League of Women Voters supports United States ratification of the North Atlantic Pact. * * * A League representative will testify before the Senate Foreign Belations Committee on behalf of the Pact. You may expect a Bequest for Action when League action can be most helpful.
A state or local league may take such action only when it is requested to do so by the National League. The state and *591 local leagues are not obligated to respond to such, a call for action, but they may not respond contrary to the position taken by the national Board or the League.
If legislation is pending on the subject, a member of the national Board may appear before the appropriate congressional committees for the purpose of delivering a statement setting forth the League’s position. Copies of such statements are sent to all local and state leagues. Such statements are sometimes made at the request of the congressional committees but more often are made at the request of the League itself.
(b) An official League publication, entitled “Facts about the League of Women Voters” states the following under the heading “Active Participation”:
When the time is right for greatest effectiveness, the League Board authorizes action on specific issues to carry out the program. Action on a national issue develops as follows:
A League Memo presents the basic information, and the League point of view, to the extent it has developed. Opposition arguments are included. League groups small enough for every member to participate discuss the problem.
If the subject is one for major emphasis a whole series of meetings may be carried on throughout the community.
Popular, easily read pamphlets reduce the problem to its essentials for busy citizens. Briefs for Action describe the current status of an issue.
Broadsides — a single, bright sheet of paper with an urgent message helps to alert the community.
Visual aids such as motion picture shorts and filmstrips are used to stimulate interest and discussion in every possible spot.
League members, other individual citizens and organizations welcome the League’s information on the effective time to act. They write letters to their Congressmen and public officials, interview them, wire them, hold large meetings to help in the coalescing of public sentiment. Newspapers and radio programs spread the word. League officers may appear at public hearings to represent the unity of opinion in the League, but it is primarily the work of individual members and citizens in their home communities that makes League work effective.
*592 Honest conviction, intelligently arrived at — in the public interest and expressed in action — that is the League goal.
(c) The operation of this type of “action” is illustrated by the action which was taken with respect to an item on the Current Agenda in 1947, as described in an official “Keport on the Program to the Members of the Council”, as follows:
What Has Been Done Under the Ou/rrent Agenda and the Basis for the Outlook for the Next Few Months.

*Indicates action taken

1. International control of atomic energy through the United Nations. Domestic control under a civilian agency to insure full development in the public interest.
The Kansas City Convention put this item first on the Current Agenda, and voted that it should be given priority emphasis by the League. The Convention direction indicated that the League should continue to support the Acheson-Lilienthal Keport and the McMahon Bill. The national Board meeting following Convention decided that the first task was to develop wide public understanding and discussion of the Acheson-Lilienthal Report, as being the most practical proposal for international control.
*On June 4,1946, there was a Request for Action relating to both international and domestic control of atomic energy. (1) On the international side, the United Nations Atomic Energy Commission was scheduled to meet soon and the United States did not yet have an official policy. Meanwhile, the atomic armaments race was going on. The Kequest for Action suggested that letters should be written to Mr. Baruch and to the President recommending the adoption of the Acheson-Lilienthal Keport as the basis for U.S. policy. (2) On the question of domestic control, the Senate had passed the McMahon Bill on June 1, but the House had not acted, and it was feared they might adjourn without passing it, thereby leaving the control of atomic energy in the hands of the Army until the 80th Congress convened.
* On June 21, 1946, there was a second Kequest for Action on atomic energy. The House Military Affairs Committee was considering the McMahon Bill. Amendments providing for military control were being added by the Committee. The bill was on the point of being indistinguishable from the May-Johnson Bill, which the League had * opposed earlier. This was followed on *593 June 28 by a third Eequest for Action, reiterating and emphasizing the need to urge the House of Eepresenta-tives not to accept the military, control amendments.
The McMahon Bill passed in the House in seriously modified form on July 20, and on the 22d it went to a House-Senate Conference. The conferees agreed to remove almost all of the most objectionable changes which the House had voted into the bill, and the conference report was sent to both Houses. It was approved on July 26, and on August 1 the President signed the Act.
16. (a) The League from time to time publishes resumes of the Democratic and the Eepublican Party platforms and pamphlets entitled, “Significant Eoll Calls” containing the voting records of the various Congressmen on bills in which the League is interested. Such documents are made available to the state and local leagues to inform them of the positions taken by their Congressmen on the items. At the state and local levels, the leagues are active in obtaining and publishing information as to the qualification of candidates for public office as well as their positions on issues which the members believe are important and of widespread interest in the community. The local leagues also conduct meetings where the candidates are invited to be questioned as to their views on such issues.
(b) “Voters Service” work is one of the League’s most important activities. Conferences are held devoted to this subject alone and materials containing suggested “Agenda For Leaders” at such conferences are prepared. An official “Voters Service” League publication, issued in October 1949, setting forth such an Agenda stated in part:
AGENDA FOE LEADERS AT VOTERS SERVICE REGIONAL CONFERENCES

General Introduction

What the citizen needs to know to be a responsible voter is the thought that will underlie our two day conference. How to get more and better informed voters out to the polls always has been and is the League’s main concern. What the League has already done to find the answer to these questions and what further contributions we can make along these lines will be explored during our meetings today and tomorrow. We shall also put a spotlight *594 on the problem of how to get the best possible candidates nominated for office.
FOUR QUESTIONS

We hope to discuss the answers in detail

1. Since the Voters Service work is the League’s unique contribution, are we emphasizing it sufficiently?
2. Are we supplying what the average citizen needs or can we improve the Voters Service job?
3. How should a good Voters Service job fit into and strengthen the League as a whole ?
4. Since too few citizens participate in the nomination of candidates for office, how can the League stimulate more interest hi this field between now and the next presidential election?
17. The League places special emphasis upon its character as a nonpartisan organization. Its policy in this respect is set forth in an official publication entitled “Election Handbook” issued in 1946, as follows:
THE LEAGUE POLICY OF NON-PARTISANSHIP
“The League of Women Voters shall not ally itself with or support any political party.” This non-partisan attribute of the League should be considered a source of strength and zealously guarded so that there can never be any question of its interests in anything but the general good. On the other hand, the League recognizes and believes in the value of the party system. It therefore urges its members to work, as individuals, in the party of their own choice.
To protect the League’s reputation as a non-partisan organization we have worked out by hard experience a series of rules for League members doing active party work. In general, the problem arises 'only when a Board member or chairman of the League undertakes leadership in a party organization. It may, however, also arise in the case of a person who does not, at the moment, hold any office in the League but who has, because of her League activity over a period bf years, become closely identified in the minds of the public with the League of Women Voters.
Leagues which have observed the rules listed below have been successful in bettering their own and the party' activities in their communities and it is expected that all Leagues will apply them without exception:
*595 1. Any League officer, Board member or leader whose na.riip has become, in the eyes of the general public, synonymous with that of the League of Women voters, must publicly resign her position in the League before undertaking active work in a party campaign as a candidate, committee member, speaker, or in any other position of active leadership. It is, of course, expected that she will retain her membership in the League and again be eligible for office when the campaign is over. It is not enough, however, to give such persons merely “a leave of absence.” They should be replaced by other League members for the balance of their terms.
2. On many occasions members of the League are asked to accept appointment to official boards and commissions, membership on which carries with it either by law or connotation, allegiance to a political party. It has been found advisable for such persons to discuss the invitation with the League Board before accepting or refusing it. The League Board is then better able to judge whether such participation will involve League program and standards, and whether acceptance or rejection of this invitation will jeopardize the League’s non-partisan position. The decision of the Board in all such cases should be the deciding factor.
3. It is inadvisable to have as a member of the Board any member of the immediate family of the holder of a partisan position in government. This will not only spare the office holder embarrassment because of the opportunity for misinterpretation of the influence that he as an officer might try to exert on the League, it will also eliminate possible embarrassment to the League in case there should be a desire on the part of the League to investigate existing conditions for which that official might be responsible. It is the responsibility of the Board to interpret what governmental positions may be considered partisan.
The National League keeps careful check on the state and local leagues and there is no known case in which a state or local league has ever contributed to, or been afiiliated with, a political party. During the 1948-1950 period herein involved, one local league was alleged to have supported a •candidate for political office. That league was subsequently disaffiliated.
18 (a) Special pamphlets and materials called “Memos,” ■“Briefs for Action,” and “Broadsides,” are published in addition to the League’s two regular publications “Action” and *596 “Trends in Government”, to help members carry out the adopted program. Some of these special publications are confined to general information on the subject matter, carrying both sides of an issue, while others are directed to supporting the League’s position if a position has been reached. The various League publications during the 1948-1950 period are generally described in the publication “Facts about the League of Women Voters” referred to in finding 15(b), as follows:
PUBLICATIONS
ITS OWN PUBLICATIONS AND EXTENSIVE CORRESPONDENCE HELP TEE THE LEAGUES TOGETHER FOR CONCERTED ACTION
action magazine goes to every member bi-monthly.
trends goes to many members on a bi-weekly subscription basis. It interprets current events, with special emphasis on news pertinent to the League’s program. It includes a summary of the status of legislation in which the League is interested.
memos are pamphlets giving background and analysis of subjects on the League Program. Issuance depends upon need.
briefs for action are short pamphlets summarizing the current political status of a subject or piece of legislation on which the League is active.
broadsides — single sheet, with important message designed for widespread distribution.
tools and guides — such as Know Tour Town's Futurey Know Tour State, Local and State Leaders Handbooks, Group Discussion in the League of Women Voters, How to Raise Money, and Tips on Publicity are issued from time to time to help members in their work.
LETTERS FROM THE NATIONAL AND STATE PRESIDENTS play an important role in League work.
ALMOST ALL LEAGUE PUBLICATIONS ARE WIDELY USED BY CITIZENS AND CITIZEN GROUPS OUTSIDE THE LEAGUE
Most publications sell for five or ten cents, a few for twenty-five cents.
A Subscription Service for $3.00 a year brings individual subscribers all League publications as they come out, including TEENDS.
(b) “Action” is a printed pamphlet consisting of approximately eight pages, published quarterly. As set forth *597 in the description of it contained in the publication referred to in paragraph, (a), it was at the beginning of the period sent to all members, and published more frequently, but later during the period it was placed on a subscription basis. It contains a section called “Congressional Spotlight” which sets forth the status of various 'bills in which the League is interested, with League support or opposition indicated.
(c) “Trends in Government” is a one-page printed sheet, issued biweekly, on a subscription basis during the 1948-1950 period. It discusses governmental matters in which the League is interested. Most issues contain a “Current Legislation” section giving the status of various bills in Congress, with an indication of whether the League supports or opposes the bill in those instances where the League has taken a position. It is described in “Action” as a “digest of trends in thought and activity on measures of national and international importance.”
(d) “Memos”, described in “Action” as pamphlets containing “background information and explanation of the arguments pro and con, with bibliography and discussion outline included”, were sold for 15 cents a copy in 1948. An example of a Memo is the 18-page pamphlet published in April 1946, entitled “Our Housing Problem”, which discussed, among other things, long-term housing needs, the then current housing shortage, slum clearance, urban redevelopment, housing for low and middle income groups, and rural housing. It also analyzed and supported the then pending Wagner-EUender-Taft bill (S. 1592), and contained a bibliography on housing.
(e) “Briefs for Action” are described in “Action” as “four to eight page printed ‘tools’ containing up-to-date information on current problems. For use by individual members or discussion groups.” They were sold for 10 cents a copy in 1948. An example of a “Brief for Action” is the informational 8-page pamphlet published on April 2, 1948, entitled “The United Nations and Palestine”, which discussed the “Background of the Palestine Policy”, “The Palestine Problem in the United Nations”, including the United States position, and “Possible Courses of U.N. Action.” Another example is the 8-page pamphlet published *598 on February 16, 1949, entitled “European Recovery on the Way”, and which discussed, analyzed, and supported the European Recovery Program (“The Marshall Plan”). The pamphlet opens with the statement “The League Position. The League of Women Voters supports the European Recovery Program under item II of the Current Agenda: Promoting international reconstruction and the expansion of world trade.”, and closed as follows:
The League of Women Voters with years of interest and support of international economic cooperation, has followed and supported the European Recovery Program as essential to the rebuilding of sound world prosperity. Watchful citizen attention is essential. Public opinion at this time will play a decisive role in the continued progress of ERP.
(f) “Broadsides” are described in “Action” as “simply written single sheets for wide distribution, to spur citizens to action on vital issues.” 100 copies were sold for 75 cents in 1948. An example of a “Broadside” is the single sheet published in May 1948, with respect to the Reciprocal Trade Agreements Act, and which stated as follows:
RECIPROCAL TRADE AT THE CROSSROADS
[Cartoon Omitted]
WHICH WAV, MR. CITIZEN?
A return to the old rough road of high trade barriers or Progress along the road of reciprocal trade a decision must be made now

The Reciprocal Trade Agreements Act will expire rm-less renewed byjune M

THE RECIPROCAL TRADE AGREEMENTS ACT authorizes the President to work out trade agreements with other nations.
It is a scientific way of tariff-making, instead of the old log-rolling method.
It was first passed in 1934, and was renewed in 1937, 1940,1943 and 1945.
It was endorsed in both Republican and Democratic party platforms in 1944.
Its record over 14 years shows that the Act has helped us to be more prosperous.
It has profited American business, labor, farmers and consumers.
*599 we Need Renewal of the Act now more than ever before * * *
To Help European Recovery. — The European nations cannot pay for the goods they need from us unless we buy from them.
To Keep Our Export Markets. — Overseas sales bring profits to many U.S. industries and farms. To Support United Nations Principles. — The Act is needed to do our part toward increasing world trade.
WRITE TOXJR SENATORS AND REPRESENTATIVES
TELL THEM YOU WANT
The Eeciprocal Trade Agreements Act renewed In its present form For three years.
(g) In addition, the League publishes a variety of other materials and pamphlets, called “General Tools”, including a “Finance Workers Handbook” which suggests methods for raising funds; local and state leaders’ handbooks; films, histories of the League; suggestions and instructions for “workshops” ; and discussion outlines.
(h) By paying their dues, all members of the League presently receive copies of the publications “National Voter,” “State Voter,” and “Local Voter” without additional charge. All other State or National League publications are purchased by the local leagues and sold to members or to others who may wish to purchase them.
(i) When a League publication is being prepared with respect to a controversial matter, a draft is first sent by the League to both governmental and private individuals and organizations on the various sides of the issue. The League’s purpose in following this procedure is to assure that all factual statements contained in the publications are accurate. If an inaccuracy is pointed out, the League corrects it prior to publication. If the League does take a position on an item, it may continue to provide information in its publications and by other means, on the arguments and positions of those holding contrary views. However, the League position is emphasized more than the contrary position, and answers, which the League considers to be persuasive and effective, to the contrary view, are given.
*600 19. (a) The League’s interest and work on the United Nations item on the Current Agenda for the period 1948-1950, as set forth in finding 12(a), commenced in the early 1940’s, when the United Nations was first discussed as a possibility. In 1945, the League actively supported the legislation before Congress to have the United States become a member. At that time the League distributed over one million pieces of literature concerning the United Nations to its local members and others interested in the subject matter. The League at all times since has maintained a continued interest in the United Nations’ operation and success. In 1948, the League launched a “Know Your United Nations Year.” The goals established by the League with respect thereto were set forth and described in the League’s publication “Action” for the period September-November, 1948, as: “1. Leaders to be trained in Workshops.[1] 2. Every member to ‘Know her United Nations.’ 3. Every community to accept its responsibility for making the United Nations work.” The League’s purpose in launching its campaign is set forth in the same publication as follows:
It is our job to apply our knowledge of local, state and national government to the United Nations. We must redouble our efforts to promote a broad perspective of the United Nations and to provide information about its work. United Nations measures before Congress must not remain inactive because of the lack of public understanding of their importance. Increasingly we must be ready to help our government (the President and Congress) to develop wise policies respecting the United Nations. It is to help prepare for such responsibility that the League of Women Voters has launched its “Know Your United Nations Year.”
The League felt that with knowledge and understanding of the United Nations would come support for it.
(b) In the conduct of said “Know Your United Nations” campaign, the League worked principally through the local leagues. The League distributed to the local leagues United *601 Nations material prepared by its staff, as well as material prepared by others, for study, discussion, and distribution throughout their communities. The local leagues during the 1948-1950 period devoted a substantial amount of time to carrying out this program item. When called upon to do so the local and state leagues took action to let their Congressmen know how their members felt about any pending legislation affecting the United Nations. For instance, the League of Women Voters of Michigan wrote a letter to Senator Ferguson congratulating him on his sponsorship of a Senate Resolution reaffirming that the United Nations is the cornerstone of United States foreign policy. When specific legislation, such as appropriations and United States membership in selected organizations under the United Nations Charter as, for example, the World Health Organization, came before Congress, the League called for action by the local leagues. Furthermore, on other matters relating to the United Nations, such as the North Atlantic Treaty, and said Senate Resolution reaffirming the United Nations as the cornerstone of United States foreign policy, national Board members appeared before congressional committees to make statements concerning the League’s position and interest. The League had an official observer at Lake Success, as well as observers at Washington sessions of the Food and Agriculture Organization and the International Bank.
20. For the promotion of the second item on plaintiff’s Current Agenda for said 1948-1950 period, i.e., “Promoting international reconstruction and the expansion of world trade”, the League similarly worked largely through the local leagues. However, concentrated direct legislative action by the National League was taken on this item in the form of active support of legislation renewing the Reciprocal Trade Agreements Act, providing for support of the European Recovery Program, and for United States participation in the International Trade Organization.
21. The third item on plaintiff’s Current Agenda for the 1948-1950 period, i.e., the federal taxes and expenditures item described in finding 12(a), remained in the study stage throughout the period, with the League neither reaching a *602 position nor taking any legislative action on any matter relating thereto.
22. Plaintiff contends, among other things, that during the period April 1, 1948, to April 1, 1950, it was a corporation organized and operated for educational purposes, and that no substantial part of its activities during said period consisted of the carrying on of propaganda or of otherwise attempting to influence legislation. It contends also that the same is true of its present activities. In support of these contentions, plaintiff has divided all of the woman hours spent by the staff and officers of the National League between April 1,1948 and April 1, 1950 in conducting National League business and activities, including those of a purely housekeeping and administrative nature, into seven categories* which it describes as follows:
(a) Organization. — This category includes all work incident to organizing new local leagues and helping existing leagues to improve their organization by such means as increasing membership, integrating members into the organization so that they become participating members, organizing committees, instruction in the manner of conducting meetings, and other such organizational activities. In connection with organizing new local leagues, the field representatives attached to the national office occasionally travel throughout the country and explain the program of the National League.
(b) Finance. — This category comprises activities involving the raising of funds for the League, the expenditure of League funds, and the instructing of local leagues in the methods of raising funds.
(c) Administration. — This category includes activities incident to the management of the national office.
(d) Public Relations. — This category includes time expended in seeking radio, television, newspaper and magazine coverage for the activities of the League.
(e) Program. — This category includes all the time spent on the various items on the Program other than the time which plaintiff considers was specifically involved in directly influencing pending legislation, as hereinafter set forth in the “legislative” category. As set forth in finding 12(a), in the *603 1948-1950 period there were three items on the Current Agenda, (a) the United Nations, (b) the European Recovery Program, and (c) fiscal policy. Plaintiff contends'that there was no legislation pending during such period involving the United Nations, as such, and therefore considers that that program item in the period in question was only an informational item. Nevertheless, as set forth below, plaintiff does include in the “legislative” category the time spent in making the statements before the congressional committees referred to in finding 19 (b). As set forth in finding 21, the fiscal item was a study item on which no position was taken. However, plaintiff concedes that a position and action was taken on the European Recovery Program item in that period, as set forth in finding 20. Therefore, the time spent in taking such action has been included by plaintiff in the “legislative” category set forth below, with all other time concerning the item, including the research and study time spent prior thereto, being included in this “program” category.
(f) Voters Service. — This category consists of time devoted to activities generally referred to in finding 16, and which are designed to urge people to vote, such as preparing newspaper advertisements and handbills setting out election dates and providing the public with information which the League believes will enable the voter to cast a more informed vote. Data on the various candidates’ educational backgrounds, experience, platforms, and voting records are given.
(g) Legislative. — This category consists of time spent in following specific measures or bills pending in Congress in which the League was interested, as well as all time devoted to taking action on such bills after a position had been taken thereon. As hereinabove noted, the time devoted to study, research, or dissemination of information on such measures or bills prior to the time the League actually took a position thereon is not included in this category. However, all time spent in preparing that part of the League’s publications indicating a League position on legislation, such as the “Congressional Spotlight” section in “Action”, as set forth in finding 18 (b), is included. General statements or articles setting forth the League’s position in favor of an item, such as the *604 United Nations, or any component part thereof, such, as the World Health Organization, has not been included in this category in situations where the statement or article did not relate to any specific bill then pending which the League was supporting or opposing.
The following is a complete list of the instances in which the League, by way of letters and telegrams to Congressmen and others, and formal statements made by League officials or a member of the League Board to a congressional committee, took a position with respect to legislation relating to items either on the Current Agenda or the Platform, and the time devoted to which is included by plaintiff in this “legislative” category: (1) Telegram of April 27, 1948, to Representatives Knutson and Doughton, supporting renewal of The Reciprocal Trade Agreements Act for three years “without crippling amendments”, and requesting that open hearings be held immediately. (2) Telegram of April 29, 1948, to Representative Michener, Chairman, House Committee on the Judiciary, and Representative Fellows, expressing League support, with qualifications, of H.R. 6163, known as the Fellows Displaced Persons Bill. (3) Telegram of May 2, 1948, to Representative Allen, Chairman of the House Rules Committee, urging that the Resolution (H.J. Res. 161) providing for United States membership in the World Health Organization be reported out of committee so that the House would have the opportunity of voting on it. (4) Day letter of August 3,1948, to Governor Dewey of New York, urging that he exercise his leadership to assure that Congress remained in session until it passed housing legislation providing for slum clearance, low rental and public housing. (5) Letter of February 2,1949, to Senator Hayden, Chairman of the Senate Committee on Rules and Administration, stating that the League believed that Senate Rule XXII, permitting termination of debate only by a two-thirds vote, hampered democratic procedures in the Senate and hoping that the facts brought out by the Committee would result in a Committee recommendation to amend the Rule to require only a majority vote. (6) Letter of March 8, 1950, to Representative Lesinski, Chairman, House Committee on Education and Labor, in which the League joined with 14 other organiza *605 tions to urge the favorable report by the Committee of legislation “providing general federal aid under state and local control for current school support.” (7) Statement made by the League President on May 17,1948, before the House Committee on Banking and Currency in support of S. 866, known as the Taft-Ellender-Wagner Housing Bill. (8) Statement made by the League President on May 17,1948, before the Senate Committee on Finance urging approval of a bill (H.R. 2245) providing for repeal of the federal taxes and license fees on the manufacture, distribution and sale of margarine. (9) Statement made by the League President on June 4, 1948, before a congressional committee in support of renewal of the Reciprocal Trade Agreements Act. (10) Statement submitted on behalf of the League on February 1.1949, to a congressional committee in support of the Trade Agreements Extension Act of 1949 (H.R. 1211). (11) Testimony of the League’s First Vice President, given February 15.1949, before the Senate Foreign Relations Committee, in support of the continuation of the European Recovery Program. (12) Testimony of the League’s First Vice President, given February 18, 1949, before the House Foreign Affairs Committee in support of the continuation of the European Recovery Program. (13) Statement submitted on behalf of the League on February 18, 1949, before the Senate Banking and Currency Committee stating the League’s hope that the Committee would report out legislation providing for urban development, slum clearance and redevelopment, public housing, and research to determine the nation’s current housing needs, to aid in the development of methods of reducing building costs, and to stimulate the construction of housing for the lower middle-income group not eligible for public housing. (14) Statement submitted on behalf of the League on March 1,1949, before a subcommittee of the House Committee on the Judiciary in support of a bill amending the Displaced Persons Act of 1948 (H.R. 1344). (15) Statement made by the League President on March 4, 1949, before the House Committee on Agriculture in support of a bill (H.R. 3) repealing the federal taxes on margarine. (16) Statement made by the League’s First Vice President on March 28, 1949, before the Home Rule Sub *606 committee of the Senate Committee on the District of Columbia in support of a bill providing for Home Rule for the District of Columbia (S. 1365). (17) Statement submitted on behalf of the League on May 5,1949, to the House Banking and Currency Committee in support of the slum clearance, public housing, and research programs described in (13) above. (18) Statement made by the League’s First Vice President on May 9,1949, before the Senate Committee on Foreign Relations in support of Senate Ratification of the North Atlantic Treaty. (19) Statement submitted on behalf of the League on June 3,1949, to the Education Subcommittee of the House Education and Labor Committee, in support of Federal Aid to Education which would go beyond the bill (H.R. 4643) then pending. (20) Statement made by the League’s First Vice President on July 14,1949, before a congressional committee in support of a bill (S. 1527) providing Home Rule for the District of Columbia. (21) Statement made by a member of the League’s board of directors on February 13, 1950, before the Thomas Subcommittee of the Senate Committee on Foreign Relations in support of a Senate Resolution (S. Con. Res. 72) reaffirming that the United Nations is the cornerstone of United States foreign policy. (22) Statement made by the League’s President on February 28,1950, before the Senate Foreign Relations Committee in support of a bill (S. 3101) providing for the continuation of the European Recovery Program.
23. (a) On the bases set forth in finding 22, the total number of woman hours devoted to each of the seven categories set forth therein during the period April 1, 1948-April 1, 1950, and the percentage each bears to the total number of hours devoted to all of the business and activities of the
National League during that period, are as follows:

Sours Percentage of total

Organization_ 65,758 46.28
Finance_ 14,383 10.14
Administration_ 19,150 13.50
Public Relations_ 11,092 7.82
Program_ 28,255 19.92
Voters Service_ 2,468 1.74
Legislative- 737 .52
Total 141, 843 99.92
*607 (b) If the purely housekeeping, organizational, and administrative activities, constituting the first four of the above categories, are eliminated, and only the three categories of Program, Voters Service, and Legislative, which constitute the activities relating to the League’s purposes and objectives, are considered, the hours and percentages are as follows:

Hours Percentage of total

Program_ 28,255 90
Voters Service_ 2,468 8
Legislative_ 737 2
Total_ 31,460 100
(c) The record does not show how many hours in the Program category were spent on items which subsequently culminated in activity falling within the Legislative category, or upon which the League ultimately took a position, such as the European Recovery Program item or, similarly how many hours were spent on items upon which the League, prior to 1948, had taken a position, such as the United Nations item or the many items set forth in the Platform, and, therefore, what the percentages would be on either of the bases set forth in paragraph (a) or (b) above if such hours were considered as falling within the Legislative category. However, the following time assumptions may reasonably be made: the Program consists of two parts, the Current Agenda and the Platform. It is the Current Agenda upon which the greater emphasis is placed and attentions are concentrated. Assuming that 80 per cent of the Program time is devoted to the Current Agenda, the remaining 20 percent allocated to the Platform would, on the above theory, be allocated to “Legislative” activity since positions had been and were currently being taken with respect to Platform items, such as Federal Housing, and Federal Aid to Education. Since the total hours allocated to Program is 28,255, 5,651 hours would on this theory be shifted from “Program” to “Legislative” (28,255 x 20%). This would leave 22,604 hours for the Current Agenda. If it be further assumed that each of the three items on the Current Agenda consumed approximately the same amount of time, there would be a total of 7,535 hours spent on each item (22,604 x 33%%). Since a position was *608 taken on the European Recovery Program item, 7,535 additional hours would thus be shifted from Program to Legislative if all hours devoted to that item were considered as falling within the Legislative category. Furthermore, in light of (a) the past positions taken on the United Nations item by the League, (b) the League’s activity on such item during the 1948-1950 period, including its urging the passage of specific legislation relating to the United Nations, and (c) its purpose in launching its “Know Your United Nations” program, which, as set forth in finding 19 (a), included keeping active “United Nations measures before Congress”, if this United Nations item also be considered as properly falling within the Legislative category, an additional 7,535 hours would be shifted from Program to Legislative.[2]
24. League officers and board members, national, state and local, are volunteer workers and receive no salaries. AIL League funds, local, state and national, are obtained through membership dues and contributions from both members and nonmembers. Approximately 1.3 percent of total National League expenditures are made in connection with the “Legislative” category set forth in subparagraph (g) of finding 22, which plaintiff refers to as “direct legislative activity”, including allocable portions of telephone, telegraph, postage and publication costs. As so defined by plaintiff in said finding, the percentages of expenditures for such activity by the state and local leagues are even smaller. No part of the net earnings of the League inures to the benefit of any individual or organization.
25. The Florida and Michigan State Leagues are typical of state leagues throughout the country, insofar as they reflect the various activities engaged in by the average state league and the time devoted to those activities. The activities of the Miami, Florida, League and the Ann Arbor, *609 Michigan, League and the number of woman hours devoted to such activities during the period April 1,1948 to April 1, 1950, were, and still are, typical of the activities and woman hours devoted to those activities by all other local leagues throughout the United States.
THE FLORIDA STATE LEAGUE
26. The League of Women Voters of Florida (hereinafter sometimes referred to as “the Florida State League”) is an integral part of the National League. It is composed of local leagues which have been recognized by the National League, as well as of members at large, college leagues, and provisional leagues.
27. The board of directors of the Florida State League consists of the state officers (president, two vice presidents, secretary and treasurer), six elected directors and up to six appointed directors. The elected directors are elected at the state convention and they appoint such additional directors, not exceeding six, as they deem necessary to carry on the work of the League. The board plans and directs the work necessary to carry out the program on state governmental matters as adopted by the state convention. It also is delegated the responsibility by the board of directors of the National League for the organization and development of local leagues, the carrying out of the state program, and the promotion in the local leagues of finance programs requisite to the furthering of the work of the League as a whole, including transmission of funds for the support of the National League budget.
28. A state convention of the Florida State League is held biennially, the time and place being determined by the board of directors. Delegates to the convention include the presidents of the local leagues within the state, members of the board of directors of the Florida State League, and certain other delegates from each local league within the state. Delegates from the local leagues must be voting members of a recognized local league, the number of delegates from each local league being determined by the number of voting members in that league. The convention considers and authorizes *610 for action, a program, elects officers and directors, adopts a budget for the ensuing year, and transacts such other business as may be presented. As with the National League, the program is for the next two years and consists of a “Platform” and a “Current Agenda.”
29. Four months prior to the convention, local leagues forward recommendations regarding the current agenda to the state board of directors. The board then formulates a proposed current agenda, which is submitted to the local leagues at least two months prior to the convention. [Recommendations for changes submitted in writing by local leagues and received by the state board of directors at least three weeks before the opening of the convention are considered by the board prior to the convention, at which time the board may modify the proposed current agenda.
30. The program of the Florida State League for 1949-1951, was set forth in an official publication entitled “Program 1949-51”, as follows:
CURRENT AGENDA
The Current Agenda is made up of those governmental issues which the Convention has chosen for concerted action. Action may include (1) providing information, (2} building public opinion, (3) supporting legislation. It is the responsibility of the state Board of Directors to supply the membership with basic information on these items and to determine at a specific time the action that, will be most effective in achieving the following goals.
THE LEAGUE OP WOMEN VOTERS OP PLORIDA WILL. SUPPORT:
Revision of the State Constitution
Establishment of a State Tax Commission
Centralized Purchasing with Open Competitive
Bidding and Uniform Specifications
Plome Rule for Cities and Counties
Complete Implementation of 'the 1947 School Act
Establishment of a Uniform, Statewide Juvenile
Court System
Improved Election Laws
During the biennium 1949-1951 the League of Women Voters of Florida will make a comprehensive study of the structure of state government based on “Know Your State.”
*611 EXPLANATION OP CURRENT AGENDA
THE LEAGUE OP WOMEN VOTERS OP FLORIDA WILL SUPPORT
Revision of the State Constitution
The League believes that Florida’s Constitution should be completely revised, that such revision can best be accomplished by a Convention of delegates elected for that specific purpose, and that the revised Constitution should be submitted to the voters for approval. We will actively support measures designed to secure such a revision.
Establishment of a State Tax Commission
The League will support the establishment of a State Tax Commission to advise the Governor and the Legislature on all tax matters, to deal with all strictly state taxes, to supervise and assist all local tax officials in their assessment of real estate, to serve as a board for equalizing assessments in the 67 counties of Florida, and as a board of appeals for the taxpayer.
Centralized Purchasing with Open Competitive Bidding and Uniform Specifications
The League believes that thousands of dollars could be saved by the establishment of a central purchasing agency, with full and exclusive authority to purchase all supplies, equipment, and materials for all institutions, offices, commissions and other agencies of the State.
Home Rule for Cities and Counties
The League believes that cities and counties should be free, within the framework of certain general principles, to frame, adopt and amend charters suited to their particular needs, with provision being made for consolidation of or cooperation among units of local government.
Complete Implementation of the 1947 School Act
The League believes that the education of its children is a primary responsibility of the state, and that in the passage of the 1947 School Act Florida took a great forward step. The League urges the complete implementation of that Act with particular emphasis on a budget of at least ninety-six million dollars for the next biennium, amendments to the Retirement System to remove inequalities and to adjust benefits, clarification of teacher welfare and salary provisions.
*612 Establishment of a Uniform, State-wide Juvenile Court System
The League will support the passage of the Waybright Bill, which is an amendment to the Constitution to permit the establishment of Juvenile Courts in Florida, to define their jurisdiction and the age below which it would apply, to provide for the qualification, method of selection, compensation and term of office of judges, probation officers and other personnel. The League believes that legislation implementing this Bill should provide:
1. Uniform age of criminal responsibility.
2. Cases involving dependency, except those requiring judicial action, to be handled by the Welfare Board.
3. Abolishment of the fee system.
4. Tenure for judges.
5. Professionally trained and competent probation officers, appointed under the merit system.
6. Associated clinics for mental and physical examination, child guidance and case work.
7. Commitment of mentally handicapped'or mentally ill children to be the function solely of the Juvenile Court, and only after a psychiatric examination.
Improved Election Laws
The League will support the following improvements in the state election laws:
1. Personal permanent registration.
2. Greater uniformitly throughout the state by means of:
a. Uniform closing date for registration books.
b. Uniform closing date for filing for office.
c. General laws, with optional variations for counties of different size, rather than the many special laws for individual counties now in effect.
3. A shorter ballot, by means of:
a. Omission of presidential electors’ names from general election ballots.
b. Omission of names of delegates at large to national conventions from primary ballots.
c. Limitation of number of candidates in primary by stricter requirements for filing for office.
4. Concentration of responsibility for elections on one official.
5. Provision for absentee voting outside the state. Item for Study
Although the League has from its beginning made a continuous study of the State Government, during the *613 next biennium we plan a coordinated and comprehensive study of the structure of State Government. This study will follow the outline suggested in the Know Your State Handbook and will be a project of all the Leagues, coordinated by a committee of the State Board, headed by the Structure of Government Chairman. This study should culminate in the publication of a State handbook.
PLATFORM
The Platform is composed of those subjects to which the State League has given sustained attention, and which the State Board may use as a basis for action when, in its opinion, local Leagues are prepared for action, and League action is desirable.
1. Improved personnel in government, through
Extension and strengthening of the merit system
Information on qualifications of candidates for office
Institute of government, giving information on governmental problems.
2. Economy and efficiency in government, through
Coordinated tax system, and suitable and equitable sources of revenue for state, county, city and school districts
Equalization of assessments as between counties, and as between counties and subdivisions within the counties.
3. Improvement and equalization of educational opportunities, through
State aid, in proportion to need, after uniform assessment requirements have been met.
4. Improved laws for health and welfare, through
Improved quality and sanitation of milk
Improved facilities for care of handicapped, dependent and delinquent children
Improved laws pertaining to minors
Improved marriage laws and requirements for premarital health examinations.
31. During the period April 1, 1948, to April 1, 1950, the members of the board of directors of the Florida State League and other State League officials devoted a total of 7,432 woman hours to all of the various activities engaged in hy the State League. In fashion similar to that set forth in finding 22, with respect to the National League, plaintiff has *614 divided all of such woman hours, including those of a purely housekeeping and administrative nature, into four categories. These categories, as defined by plaintiff, and the number o£ hours spent on each, are as follows:
(a) Study and Discussion of State Issues — 2,015 hours.. This category covers work performed by state Board members, including research and preparation of study materials,,, on the items on the Current Agenda set forth in finding 30.. Also included are visits of state Board members to local' leagues to assist them in study and discussion techniques-, concerning the items.
(b) Voters Service Activities — 1,348 hours. Included: herein are: (1) Preparation of questionnaires which were sent to candidates for state office, asking each to state his-qualifications, what he considered were the most important issues with which he would be confronted, and his suggested', solutions. The questionnaires returned were published verbatim by the State League in local newspapers and copies-, were distributed by the League, without any addition or-comment; (2) Preparation and publication of an analysis of amendments to the State Constitution; (3) Preparation of" an analysis of the voting records of the State’s Congressmen (4) Arranging and holding a regional Voters Service Conference, which was open to the public, at which were discussed the techniques of getting out the vote, procedures for-holding candidates’ meetings, how to promote registration,, and other related matters; (5) Arranging and holding two-area workshops, which were designed to instruct the local leagues in getting out the vote; and (6) Ten visits to local leagues by state Board members concerned with voters service activities.
(c) Organizational and Promotional Activities — 3,888'. hours, 2,640 of which were expended by board members on visits to local leagues and 1,248 were spent on reviewing-local league minutes- and bulletins, as well as on correspond- ■ ence of an internal nature between the state Board and the-local leagues. This was a period of accelerated growth and. expansion of the League in Florida, with many new locals,being established. One of the purposes of the many trips. *615 made by tbe State League officials to the local leagues was to explain the program of the National League.
(d) Legislative Activity — 181 hours. This category consists of the following: (1) All of the time (151 hours) spent in Tallahassee by one State League official, the Legislative Chairman of the State League, attending the biennial, two-week session of the state legislature and in preparing legislative newsletters for the membership. This official acted as an observer at sessions of the Florida House and Senate and at some of the legislative committee sessions. It was her duty to be familiar with what was happening regarding measures with which the State League was concerned. This official made one statement before a legislative committee, at the request of that committee, urging adoption of a bill calling for a constitutional convention to revise the constitution of Florida. The Legislative Chairman registered as a lobbyist under a Florida House Rule. (2) Time spent by state Board members in the direct work of supporting the following specific bills, including the time spent in the writing of letters by the State League President in support of the following bills: (a) the Waybright Bill, providing for the establishment of a statewide uniform Juvenile Court system; (b) a resolution calling for a state constitutional convention; (c) measures providing for inspection of public eating places; (d) a bill providing for a State Tax Commission which would assist taxing authorities throughout the State in establishing criteria for the assessment of property; (e) a bill providing for central purchasing for all departments of the State Government; and (f) a bill providing for a teacher retirement plan.
32. The Florida State League has never contributed to or been affiliated with any political party, nor has it ever endorsed, approved or opposed any candidate for public office.
THE MIAMI, FLORIDA LEAGUE
33. The League of Women Voters of Miami, Florida (hereinafter sometimes referred to as the Miami League) is an integral part of the League of Women Voters of the United States and of the League of Women Voters of Florida.
*616 34. Article II of the By-Laws of the Miami League, entitled “Purpose and Policy”, provides as follows :
Seo. 1. Purpose. — The purpose of the League of Women Voters of Miami shall be to promote political responsibility through informed and active participation of citizens in the government.
Seo. 2. Policy. — The League of Women Voters of Miami may take action on local governmental measures and policies in the public interest in conformity with the Platform of the League of Women Voters of the United States. It shall not support or oppose any political party or candidate.
35. The ruling body of the Miami League, as is the case of all other local leagues, is the board of directors. The board of the Miami League consists of its officers (president, two vice presidents, secretary and treasurer), six elected directors, and not more than six appointed directors. The authority and duties of the board of directors is prescribed in Article IV of the by-laws as follows:
Seo. 4. Powers and Duties. — The Board of Directors shall have full charge of the property and business of the organization, with full power and authority to manage and conduct same, subject to the instruction of the general membership. It shall plan and direct the work necessary to carry out the program as adopted by the national Convention, the state Convention and the Annual Meeting. The Board shall create and designate such special committees as it may deem necessary.
36. The Miami League holds an annual meeting between March 1 and May 1, the exact date of which is determined by the board of directors. At this meeting, the membership adopts a local program for the ensuing year, as well as a budget, and elects officers, directors and members of a nominating committee.
37. In addition to the items included in the national Current Agenda and Platform, a local league may establish a local current agenda and take action on local governmental measui’es and policies which it deems to be in the public interest provided they are in conformity with the position stated' in the platforms of the National League and the Florida State League. The Miami League establishes such a local current agenda for the purpose of studying the items on that *617 agenda to determine what, if any, action it will take with regard to any of those items. Article IX of the by-laws of the Miami League, entitled “Program”, provides as follows::
Seo. 1. Authorisation. — The governmental principles-adopted by the National Convention, and supported by the League as a whole, constitute the authorization for the adoption of the Program.
Seo. 2. Program. — The Program consists of the local governmental measures and policies on which the League-, of Women Voters of Miami may take action. The Current Agenda and Continuing Eesponsibilities as hereinafter defined constitute the Program.
Seo. 3. Current Agenda. — The Current Agenda shall be limited to such local government issues as the membership shall choose for action in the following manner r
a. The Board of Directors shall consider the recommendations sent in by the voting members two months-prior to the Annual Meeting, and shall formulate a proposed Current Agenda.
b. The Proposed Current Agenda shall be sent to all members one month before the Annual Meeting.
c. A maj ori-ty vote of voting members present and voting at the Annual Meeting shall be required for the adoption of subjects in the Proposed Current Agenda as presented to the Annual Meeting by the Board of Directors.
d. Becommendations for Current Agenda submitted by voting members two months prior to the Annual Meeting, but not recommended by the Board of Directors, may be considered by the Annual Meeting provided that: (1) the Annual Meeting shall order consideration by a two-thirds vote and (2) the Annual Meeting-shall adopt the item by a two thirds vote.
e. Changes in the Current Agenda, in the case of altered conditions, may be made provided that: (1) information concerning the proposed changes has been sent to all members at least two weeks prior to a general membership meeting at which the change is to be discussed, and (2) final action by the membership is taken at succeeding meeting.
Sec. 4. Continuing Responsibilities. — Continuing Ee-sponsibilities shall be those positions on local governmental issues to which the League of Women Voters of Miami has given sustained attention, as determined by the Annual Meeting.
a. The Continuing Eesponsibilities may be amended by a two-thirds vote of any Annual Meeting provided* *618 that notice of the proposed changes shall have been sent by the Board of Directors to all members one month before the Annual Meeting.
b. The Annual Meeting may act upon any change proposed by a member if such change has been sent to the Board of Directors two months prior to the Annual Meeting but has not been recommended by the Board of Directors, provided that, (1) the Annual Meeting shall order consideration by a two-thirds vote, and (2) the annual meeting shall adopt the item by a two-thirds vote.
c. Every six years the Board shall review the Continuing Responsibilities and submit to the members its recommendations for keeping the Continuing Responsibilities current, using the regular procedure outlined in Section 3, (a) and (b).
Sec. 5. Member Action. — Members may act in the name of the League of Women Voters only when authorized to do so by the proper Board of Directors.
38. (a) The program of the Miami League for the period 1948-1949 was, as set forth in an official Bulletin, as follows:
Strengthening of the organization and procedure of City and County Government with emphasis on long term planning and economy, central purchasing, and merit system.
(b) The program of the Miami League for the period 1949-1950 was, as similarly set forth, as follows:
To work for the strengthening of the organization and procedure of city and county government, emphasizing long-term planning and economy, central purchasing and the merit system and specifically:
1. To urge the establishment of an area city-county planning board.
2. To urge or support the passage of a local bill in the State legislature restricting the power of the Internal Improvement Board to sell any more bay bottom lands, except that they may be sold to a political body for public use.
3. To study the structure of city and county government, based on “Know Your Town” and “Know Your County.”
39. During the period April 1, 1948, to April 1, 1950, the members of the Miami League devoted a total of 9,231 woman Lours to all of the various activities engaged in by that *619 league. In fashion similar to that set forth in findings 22 and 31 with respect to the National and Florida State Leagues respectively, plaintiff has divided all of such woman hours,, including those of a purely housekeeping and administrative-nature, into three categories. These categories, as defined, by plaintiff, and the number of hours spent on each, are as-follows:
(a) Organizational Activities — 2,431 hours. This category includes obtaining and orienting members; soliciting-contributions and planning fund raising activities; board" meetings; the keeping of the treasurer’s books; and other-similar housekeeping activities.
(b) Citizenship Education — 6,728 hours. This category-has been further subdivided by plaintiff, as follows:
(1) General Meetings — 4,275 hours. There were 20 of" these meetings in this period. These meetings were all open-, to the public, and included several which might also fall within the “Voters Service” classification, such as meetings at which all candidates for a public office were given equal time- and asked to speak on their qualifications and platforms and. an all-day meeting at which information on registration, voting, party platforms and jury duty was disseminated by-representatives of both the Democratic and ^Republican. Parties and of the county government. Other meetings held included: a meeting at which the Miami League and 24 other-organizations organized to create the “United Nations Cooperative Council of Dade County”, which was designed to-increase public knowledge and understanding of the United. Nations; a meeting at which professional planners discussed the importance of county planning for the growth of the community and for better land use; meetings on League policies,, procedures, and program; a meeting at which a private-psychiatrist spoke and exhibited a film dealing with the state’s-mental health facilities; a meeting at which speakers from a state agency, the Community Chest, and from the community-provided information on the state’s facilities for child delinquency ; a meeting at which all the county legislators reported on what the legislature had accomplished at its last session with respect to legislation in which the Miami League was-interested; a meeting featuring a speaker who spoke on. *620 regional planning; a meeting featuring a speaker and a film in city planning; and a meeting at which. Senator Pepper .gave his views on national legislation. One meeting was in the form of a United Nations Pageant, depicting the roles of the specialized agencies, the participants including League members as well as persons of 19 different nationalities. At all but one meeting at which there was a speaker, the speaker was an independent person and not a League member, all speakers being subject to questions.
(2) Discussion Meetings — 754 hours. These were meetings where members made reports on and discussed various topics being studied by the group. In the period April 1, 1948, to April 1,1950, there were 11 such meetings taken up with study of the Florida Juvenile Court system, 7 on the Collective Security Pact, 2 on the United Nations, and 15 others dealing with the Federal budget, planning, and a study of the state government, pursuant to a “Know Your State” program.
(8) Publicity — 133 hours. This category includes all time spent in preparation of news items, including notices and accounts of meetings; preparing and delivering radio programs; and contacting newspapers and radio stations to arrange for publication or broadcast. The Miami League took no position in the broadcast about the subject involved, ■all scripts being first submitted to the station for approval.
(4) Publications — 202 hours. This category includes the time expended in preparing and mailing to members the local league “Bulletin”, notices of meetings, and other organizational information. Also included is time required ■to distribute various League publications, including United Nations materials supplied by the National League, the United Nations Association and the State Department. The ■distribution was made to such organizations as schools, libraries and the Miami Chamber of Commerce. The United Nations material was also distributed by league members •at a booth set up for that purpose in a downtown Miami ■store. The Bulletin sometimes contained a “Call to Action”, ■such as the issue of February 6, 1950, which referred to S. 1527 granting Home Buie to the District of Columbia and the fact that
*621 the D.C. Committee refused to report it. The drive is now on to secure the necessary 218 signatures to the Kennedy Discharge Petition (#19) which would bring this Bill to the House Floor for a vote. If you wish to help extend the franchise to the District residents, write as an individual (your League President writes for the League) urging your representative to sign this Petition NOW. His address: Rep. George Smathers, House Office Building, Washington, D.C.
(5) Other Oonvrmmity Cooperation — 210 hours. Most of this time was expended in organizing the United Nations Council referred to above. Other activities included cooperating with the Miami Civic Federation in a study of city planning by exhibiting a film called “The City” to various organizations in the community; cooperating with the courts in publicizing the provisions of a new state law permitting women to serve on juries; and cooperating with the University of Miami in planning and sponsoring a group of lectures on the subject of “Interpretation of our Times.”
(6) Observers — 332 hours. This category includes the time of members who were appointed to attend meetings of the city and county commissions and school boards and report to local league meetings what had transpired. The observers took no part in the commission or board meetings and made no statements.
(7) Voters Service — 780 hours. Included in this category •are the following activities:
(A) preparing questionnaires and interviewing candidates for public office concerning the candidates’ qualifications, what each considered the important problems to be, and how he would solve them. The replies were published in local newspapers, and otherwise distributed; (B) preparing and distributing information informing local residents why they should vote in a school election and preparing and distributing an analysis of proposed amendments to the Miami City Charter. No position was taken on how the residents should vote or with respect to the amendments; (C) arranging and conducting candidates’ meetings at which the various candidates spoke; (D) conducting an information booth at the courthouse in the spring and fall, at which the Miami League had two voting machines. Instruction was *622 given to voters on the use of the machines. Also, sample ballots were distributed, precinct maps were made available to inform persons where they should vote, and transportation to the polls was offered to any person desiring it; (E) preparing and distributing copies of a mimeographed sheet called “They Bepresent You”, which included biographical data on the national and state representatives from the various districts; (F) sending delegates to an area league Conference on Voters Service, at which they received information and techniques for helping voters to register; (G) preparation and distribution of handbills urging residents to vote-
(8) Surveys — 42 hours. This category involved the study of the town and state governments and was based on the National League publications entitled, “Know Your Town Survey” and “Know Your State Survey”. League members were assigned chapters of those booklets, did research on the questions in the chapters, and reported'back to the membership so that members would have a comprehensive idea of how the local government operated. The Miami League was also responsible for compiling information to be placed in a Florida State League publication designed to cover the organization and operation of the state government.
(c) Legislative Activities — 72 hours. Included in this category are :
(1) all letters or telegrams written to members of Congress, of which there was one in the April 1, 1948-ApriI 1, 1949 period and nine in the April 1, 1949-April 1, 1950 period, in which a position was taken and action was urged on pending legislation. These communications urged support of the following bills: a bill dealing with a loan for United Nations Headquarters; the Taft-Ellender-Wagner Housing Bill for slum clearance and public housing; Federal Aid to Education; Home Buie for the District of Columbia; amendment of the Displaced Persons Act to increase quotas and eliminate mortgaging of future quotas; a House resolution providing for United States membership in the International Trade Organization; and Bemoval of the Federal Tax on Margarine. Opposition was expressed to the Equal Bights Amendment to the Constitution.
*623 (2) all communications written to state and local legislators, of which there were 13, in which a position was taken and action was urged on pending legislation. These communications urged support of the following bills: an amendment to the State Constitution to provide a uniform Juvenile Court system; a bill providing for competitive bidding and central purchasing by the State; a bill establishing a State Tax Commission to advise the Governor and Legislature on all state tax matters; bills on teacher retirement which would give an allowance of $75 monthly to teachers having served 30 years and who were incapacitated and without means of support; and a resolution calling for a Constitutional Convention to vote on revision of the State Constitution. The League opposed bills which would lower the standards for inspecting and grading milk and which would authorize the city of Miami “to construct municipal projects and finance all costs and expenses thereof.” The League also urged a State Senator to support the restoration to the budget of an amount cut from the appropriation for Aid to Dependent Children.
(3) distribution of material supplied by the National League and the State Department at a World Trade Fair conducted by the Miami Chamber of Commerce. The Miami League was requested to operate a booth at the Fair by the Chamber of Commerce. Thirty hours of the total of 72 hours was expended in this manner.
(4) time spent by League members in preparing articles for the Miami League Bulletin which contained a statement or opinion either for or against a particular measure or bill.
As is the situation with the National and Florida State Leagues, the record does not show how many hours in the other categories were spent on items which ultimately culminated in activity which would fall within the “Legislative” category. Also, as noted, study and discussion hours on items upon which the Miami League took a position during the period in question are not included in the Legislative ■category. For instance, the Miami League took a position in favor of the reorganization of the Juvenile Court system. However, as noted above, all the time spent in studying the ¡then current system is included in the “Citizenship Educa *624 tion” category. Also, time spent by individual members in responding to calls or requests for action, such as are set forth in paragraph (b) (4) above, contained in the local Bulletin, or as are sent from the National League office, is not included, since it is generally not known whether individual members respond to such calls or requests.
40. The Miami League has never contributed to or been affiliated with a political party, nor has it ever endorsed, approved or opposed any candidate for public office.
THE MICHIGAN STATE LEAGUE
41. The League of Women Voters of Michigan (hereinafter sometimes called the “Michigan State League”) is composed on members of local leagues which have been recognized by the National League, of members at large, and associate members.
42. The purpose of the Michigan State League, as stated in its Articles of Association, is:
* * * to promote education in citizenship, efficiency in government, needed legislation and international cooperation to prevent war. The Michigan League of Women Voters urges every woman to become an enrolled voter, but as an organization it shall not be allied with-, or support any political party.
Article II of its By-Laws, entitled “Purpose and Policy”' provides:
Sec. 1. Purpose of the League of Women Voters of' Michigan shall be to promote political responsibility through informed and active participation of citizens in' government.
Sec. 2. Policy. — The League may take action on state-governmental measures and policies in the public interest in conformity with the Platform of the League of' Women Voters of the United States. It shall not support. or oppose any political party or candidate.
43. The board of directors of the Michigan State League-consists of its officers, four elected directors, and not more-than eight additional directors appointed by the elected direc- • tors. The board of directors has full power and authority to-manage the property and business of the organization, subject to the instructions of the convention. Only voting; *625 members of the Michigan State League may serve as directors.
44. A convention of the Michigan State League is held biennially. Delegates include those selected from each local league in the state, the president of each local league, and the members of the board of directors of the state league. Delegates are chosen by the local leagues, the number from each local depending on the number of voting members therein. Among other things, the convention considers and authorizes for action a state program, elects officers and directors, and adopts a budget.
45. Article X of the By-Laws entitled “Program”, provides as follows:
Seo. 1. Current Agenda. — Current Agenda shall be limited to such current state governmental issues as the Convention shall choose for concerted action.
(a) The Board of Directors shall consider the recommendations which have been sent in by the local Leagues two months prior to the Convention and shall formulate a proposed Current Agenda. Such proposed Current Agenda shall be submitted by the Board to the local League boards at least one month prior to the Convention.
(b) Recommendations for changes submitted in writing by local League boards and received by the Board of Directors at least three weeks before the opening of the Convention shall be considered by the Board prior to the Convention at which time the Board may modify the proposed Current Agenda.
(c) Changes made under “b” may not be voted on by the Convention on the same day on which they are proposed.
(d) A majority vote of those present and voting shall be required for adoption of subjects in the proposed Current Agenda as presented to the Convention by the Board of Directors.
(e) Further changes in the proposed Current Agenda submitted for consideration to but not recommended by the Board of Directors may be made by the Convention, provided that (1) the Convention shall order consideration by a two-thirds vote; (2) the vote on the proposed change shall not be taken on the same day as the order for consideration; and (3) the Convention shall adopt the change by a two-thirds vote.
*626 Seo. 2. Member Action. — Members may act in the name of the League of Women Voters of Michigan only when authorized to do so by the Board of Directors.
Sec. 3. Local League Action. — Local Leagues may take action on state governmental matters only when authorized by the Board of Directors of the League of Women Voters of Michigan.
48. (a) The program of the Michigan State League for 1948-1949 was set forth in an official publication as follows:
The items on the current Agenda are those governmental issues which the Michigan Convention has chosen for concerted action. Action may consist of (1) providing information, (2) building public opinion, (3) supporting legislation.
CURRENT AGENDA

I. Work toward State Constitutional Revision-

II. Conduct am, educational program to further citizen understanding of Michigan's fiscal problems

III. A Study of State and local governmental services for dependent, neglected, delinguent and afflicted children. This is to be directed toward a legislative program providing for:
1. Reorganization of State services to children under one authority.
2. Improvement of the standards and organization of the Juvenile Services of the County Probate Courts throughout the State.
EXPLANATION OP CURRENT AGENDA

1. State Constitutional Revision

Studies by the League of Women Voters of Michigan reveal that the major faults of the existing state constitution are:
1. Lack of co-ordination in the executive branch of the .state government
2. Complicated court systems
3. Improper apportionment
4. Too detailed provisions for local governments ■5. Too much statutory detail
6. Long and complicated ballot
7. Inadequate provision for amendment and revision
The League of Women Voters of Michigan remains committed to complete constitutional revision and will work' to help people understand the need to vote for a constitutional convention in the 1948 fall elections. If *627 the proposal for a constitutional convention is defeated, the League will work for revision of the constitution by amendment and legislative act to secure a briefer, well-coordinated, modern state document.

II. Fiscal Problems

The chief criticisms leveled at Michigan’s fiscal system by tax authorities as long ago as the middle thirties were:
1. Too heavy dependence upon consumer taxes
2. Absence of progressive taxes
3. Constitutional limitations narrowing the area within which the Legislature may act upon fiscal problems
4. Multiplicity and inefficient overlapping of governmental units
These conditions still exist. As a matter of fact, the situation has been complicated by additional constitutional amendments such as the gasoline tax and sales tax diversion amendments. The state is now operating under a tax system which is barely able to meet necessary operating costs, much less to meet the cost of needed capital improvements accumulated during the war period.
If Michigan is to assume its place as a wealthy industrial state in providing necessary and adequate services and capital improvements, the people must recognize the necessity for adopting adequate tax measures. The complexity of the fiscal situation, however, is such that an understanding of it is impossible without a full scale educational program designed to acquaint the public with all the facts. This the League proposes to do.

III. Pub lie /Services For GMldren

A state-wide study of services to children by state and local units of government to form the basis of intelligent and informed action has the following objectives:
1. The employment of personnel highly trained in the handling of juvenile problems and the use of the best recognized techniques in their solution.
2. The administration of children’s services in a coordinate fashion by state and local units of government replacing the present complex decentralized system.
3. Study of the adequacy and use of funds by local, state and federal units of government within the state for health, recreation and social aid for children.
4. Broad program of information and study through citizen and professional groups throughout the state and in various communities to create and continue interest *628 in and support for such excellent services as are rendered and for action to improve other public services to youth.
This program publication also sets forth the following with respect to the Michigan State League’s “continuing responsibilities” :
THE LEAGUE 0E WOMEN VOTERS OF MICHIGAN REAFFIRMS ITS RET,TEE THAT INFORMED AND ACTIVE PARTICIPATION OF CITIZENS IN GOVERNMENT IS ESSENTIAL FOR A DEMOCRACY
During the past years, The League has supported, at the state level, the following positions, and they are continuing responsibilities:
IN THE AREA OF GOVERNMENT AND ITS OPERATION :
Qualified personnel in government service (civil service).
Opposition to discrimination in employment based on marital status, color, creed, race, or national origin (FEPC).
Administrative organization to promote efficiency and responsibility in local and state governments.
Constitutional re-apportionment of the state legislature.
County Home Rule.
Periodic State Constitutional Conventions.
Study of the legislative processes with a view to supporting remedial measures.
Manager plan for local governments.
Development of a co-ordinated state tax system through scientific research procedure, with increasing regard for the principal [sic] of ability to pay.
Opposition to any regressive taxes, including the sales tax.
IN THE AREA OF SOCIAL AND ECONOMIC WELFARE :
Provision for crippled and dependent children. Modern adoption laws.
An adequate child labor code for Michigan.
Labor standards, health, recreation and other facilities which will aid in the prevention of delinquency.
Non-political administration of state and local relief by trained personnel, adequately financed.
Effective co-ordination between state and local organizations in public health and welfare services.
Development of an adequate housing authority.
Opposition to inter-state trade barriers.
*629 IN THE AREA OF EDUCATION :
Sufficient and scientifically apportioned public' funds for public education and libraries.
Units of school taxation and administration large enough for economy and efficiency.
Civil service for teachers (tenure).
Protection of academic freedom as basic to sound education.
(b) The program for 1949-1951 was similarly described in an official publication as follows:
CURRENT AGENDA
1. Amendment of the State Constitution to provide for periodic re-apportionment of the State Legislature.
2. Development of a co-ordinated State tax system with increasing regard for the principle of ability to pay. Support of necessary tax measures consistent with this principle. Opposition to regressive taxes.
3. Study of State and local governmental services for dependent, neglected, delinquent and afflicted children. Support of a legislative program to strengthen these services.
EXPLANATION OP CURRENT AGENDA

I. Re-apportionment of State Legislature

The present apportionment of the Legislature does not carry out the intent of the Constitution.
The Constitution calls for re-apportionment and redistricting of the Legislature by the Legislature three years after each United States Census. Because the Legislature is immune from injunction or mandamus, there is now no way to force it to act.
The House and the Senate were both re-apportioned in 1925. The House was again re-apportioned, to some extent, in 1943.
Representatives in the House come from districts which vary in population from 26,671 to 78,758; Senators come from districts which vary in population from 72,350 to 334,878. Two-thirds of the Senate districts are over-represented.
A properly representative Legislature might recognize the need for a thorough revision of the State Constitution and place a call for a Constitutional Convention on the ballot by legislative act before it automatically comes up in 1958.
Delegates to a Constitutional Convention are elected from State senatorial districts. A properly districted *630 Senate would provide the basis for a more nearly representative convention.
Refusal of the Legislature to act, coupled with its immunity from legal compulsion, requires an amendment to the Constitution to guarantee periodic reapportionment.

II. Fiscal Problems

A rational solution of Michigan’s fiscal system requires the development of a co-ordinated State tax system with increasing regard for the principle of ability to pay. The attributes of a good tax system include: (1) tax adequacy, (2) equity in burden, (3) simplicity, certainty and economy in administration, (4) economic soundness, and (5) inherent flexibility. For the most part these five principles do not apply to Michigan’s fiscal system which has been criticized as having the following shortcomings:
1. Too heavy dependence upon consumer taxes.
2. A minimum of progressive taxes.
3. Constitutional limitations narrowing the area within which the Legislature may act upon fiscal problems.
4. Multiplicity and inefficient overlapping of governmental units.
The League of Women Voters is committed to working for over-all tax reform. In the meantime it recognizes that in the process of getting over-all tax reform it may be necessary to support the adoption of tax measures on a piecemeal basis in order to keep the State government functioning. Therefore, the League may support a specific tax measure if (1) the specific tax proposal is necessary to prevent a crisis in State finances, and (2) if the specific tax proposal is consistent with, and a necessary part of, a co-ordinated tax program based upon the ability to pay principle. It will oppose specific tax proposals which are of a regressive nature.

III. Public Services For Children

A study of the present program of State and local services to children is essential for its evaluation and to secure necessary improvements. The objectives are to:
1. Co-ordinate the administration of children’s services by State and local units of government, replacing the present complex decentralized system.
2. Employ personnel highly trained in the use of the •best recognized techniques in dealing with juvenile problems.
*631 3. Sponsor a broad program of information and study by citizens and professional groups in order to secure and maintain liigh standards of services to children.
This program publication also set forth the “continuing responsibilities”, which were similar to those of the previous year.
47. During the period April 1, 1948, to April 1, 1950, the Michigan State League devoted a total of 11,521 woman hours to all of its various activities. In fashion similar to that set forth above with respect to the National League, the Florida State League, and the Miami League, plaintiff has divided all of such woman hours, including those of a purely housekeeping and administrative nature, into three principal categories. These categories, as defined by plaintiff, and the number of hours spent on each, are as follows:
(a) citizeNSHip education — 6,139 hours. This category includes the following activities:
(1) National Agenda I terns — 1,410 hours.
A. The United Nations — 1,252 hours. 1. Preparation for, attendance at, and correspondence relating to a United Nations Planning Conference in Ann Arbor, Michigan, to which delegates came from the various local leagues — 203 hours. The United Nations Conference at Lake Success, New York, to which two delegates were sent — 98 hours. S. Six Kegional Planning Conferences held throughout the State — 178 hours. A 25 speeches throughout the State given by the State League’s United Nations Committee Chairmen — 545 hours. 5. At the request of the Ninth Annual Planners’ Institute in Detroit, the State League was asked to conduct a portion of the Institute’s proceedings for the purpose of explaining the United Nations. Materials concerning the United Nations were also distributed by the State League at the Conference. The total time involved in this project was 47 hours. 6. State workshop on the United Nations; sending publications to local Michigan leagues; making comments on proposed agenda items for the next year — 21 hours. 7. Telephone calls and correspondence between the State League and various local leagues concerning the United Nations — 160 hours.
*632 B. World Trade. — Time devoted to the World Trade item on the national current agenda — 91 hours. Part of this time (18) hours was used by the State League Chairman in traveling to and making speeches before other organizations, usually at their request. One hour was devoted to the writing of a letter to the Governor asking that he proclaim World Trade Week, and 72 hours were spent in corresponding with local Michigan leagues on the item.
C. Federal Budget. — Regional conference to acquaint League members with the workings of the Federal budget and correspondence with the local Michigan leagues in arranging for the conference — 67 hours.
(2) State Agenda Items — 3,293 hours. This category includes the following activities and hours:
A. State Taxation — 1,740 hours. The studies conducted were pursuant to the second item on the Current Agendas, as set forth in finding 46. The Michigan State League neither supported nor opposed any specific measure or bill dealing with state taxation during the period 1948-1950, although, as its Current Agendas and “Explanations” thereof show, it was taking certain general positions concerning the item, such as opposition to sales taxes. The activities and hours devoted to this state taxation item were as follows: 1. State Taxation Workshop held in East Lansing, Michigan — 210 hours. This was an interleague meeting designed to prepare leaders for the study of the item. %. Publication and distribution of a booklet called “Life and Taxes” — 150 hours. This was an informational-type booklet, explaining the tax structure and system in Michigan. 3. State Tax Institute— 714 hours. League members presented research papers to delegates from local leagues on aspects of the tax structure of Michigan, the writers taking no positions. If,. Three State Board members interviewed the Governor and urged that he appoint a Tax Study Commission to examine the tax situation in Michigan and make recommendations with respect thereto. (At the same time, the League members urged appointment of a Study Commission on Services for Children.) The members did not make any recommendations concerning the areas to be studied or the results to be achieved. These activities took 12 hours. 5. General cor *633 respondence with local Michigan leagues on the item — 72 hours. 6. Preparation and distribution of a bulletin and other materials on the item — 7 hours. 7. Time spent by a delegate in attending a “National Tax Association Conference” in Boston, Massachusetts — 36 hours. 8. Time spent on interleague conference in Detroit, Michigan, of local league Taxation Chairmen — 128 hours. 9. Preparation of a “Tax Skit”, which attempted to portray the tax problem in Michigan — 24 hours. 10. Preparation of a discussion outline for tax research studies by the State League — 18 hours. 11. Preparation of 12 Tax Research study papers on various aspects of state taxation — 256 hours. The papers were prepared by League members under the direction of the State League’s Tax Chairman. 12. Mailing to local Michigan leagues tax materials which compared the Michigan tax system with those of other states — 72 hours. 13. Speeches before local leagues and, at their request, before other organizations by the State League’s Tax Chairman concerning the tax system in Michigan — 41 hours,
B. Constitutional Revision. — Meetings of the State Affairs Chairmen of the local leagues and other local league representatives to consider possible state constitutional revision, which was item 1 on the 1948-1949 Agenda, set forth in finding 46(a). There was also one trip to East Lansing by a State League member to inquire whether the State Legislature was planning to take any action regarding reapportionment. These activities totaled 40 hours.
C. Children’s Services — 658 hours. This category involved item 3 of the Current Agendas, set forth in finding 46. The League neither supported nor opposed any specific legislation on children’s services during the period from April 1,1948, through April 1,1950, although, as its Current Agendas and “Explanations” thereof show, it was taking certain general positions concerning the item, such as a replacement of “the present complex decentralized system.” The following activities and hours were devoted to the item: 1. Sending questionnaires to local leagues to determine what they were doing concerning the item — 6 hours. 2. Attendance by a League representative at a Governor’s Conference on Children and Youth — 8 hours. 3. Interviewing the Governor and urging *634 appointment of a Study Commission on Services for Children. This time is included in paragraph (2) A-4- above. A Mailing to local leagues copies of all bills before the State-Legislature which affected children, as well as copies of various materials on children’s services obtained from state agencies; preparation of a bibliography of material containing information on children’s services and mailing it to the local leagues — 142 hours. 5. Attendance by a League representative at a series of meetings of the Michigan State Youth Commission — 54 hours. 6. Attendance by League representatives at a state conference of the Michigan Welfare League— 80 hours. 7. Attendance by League delegates at a Citizens. Organization Council Meeting — 32 hours. 8. Visits to local' leagues by the State League’s Children’s Services Chairman — 60 hours. 9. General correspondence with local leagues dealing with the item — 180 hours. 10. Meetings of the State League’s Children’s Services Committee — 96 hours.
D. Beapportionment of the State Legislature — 855 hours. This category involved item 1 of the 1949-1951 Current Agenda, set forth in finding 46 (b). Included are the following activities: 1. Attendance by eight State Board members at a conference at Lansing of all organizations in the state-interested in reapportionment, including labor organizations, teachers’ groups, the State Bar Association, the Farm Bureau and the other farm groups — 588 hours. At this meeting, professors from the University of Michigan Law School and' Political Science Department discussed various methods of reapportionment. These discussions were published and distributed to the public. 8. State League Beapportionment Committee Meeting at Ann Arbor, Michigan — -45 hours. 3. State Beapportionment Conference at Lansing, Michigan, of the same type described in 1 above — 65 hours. Subsequent meetings of a “Steering Committee on Beapportionment”, of the same group, involved 60 hours. A Visits to local leagues by the Beapportionment Committee Chairman — 25 hours. 5. General correspondence with local leagues relating to the item — 72 hours. During the period’ April 1, 1948, through April 1, 1950, the Michigan State League favored the principle of periodic reapportionment of the State Legislature,, as set forth in its 1949-1951 Current Agenda, but took no *635 action on any specific legislation concerning the item. The work done on this subject during such period was aimed at ultimately coming up with a positive program.
(3) Voters Service — 764 hours. Included in this category are the following activities: (A) Interviewing candidates in the primaries and state elections; publishing and distributing bulletins containing biographical and background information on the candidates. (B) Sending a questionnaire to local leagues inquiring about the usefulness of Voters Service materials furnished to the local leagues. (C) General correspondence from the State League to the local leagues dealing with Voters Service. (D) Conducting a Voters Service Institute, attended by members of the local leagues, for the purpose of discussing techniques of Voters Service work. (E) Attending a regional conference of the State League on Voters Service, at which, among other things, a candidate’s questionnaire was prepared and distributed. Proceedings of this conference were mimeographed and sent to all the local leagues in the state. (F) Preparation and publication of a Voters Service Quiz called “What’s the U.S. to You”, which contained information on the importance of the vote and urged persons to become active in politics in the party of their choice. It also contained a series of questions, the answers to which provided information about the political parties and election procedures in the various localities throughout the state.
(4) Convention and Council Meetings — 672 hours. This ■category includes time expended between April 1,1948, and April 1,1950, at the State League conventions by State Board members (476 hours) and time expended by state delegates at a meeting of the National Council (196 hours).
(b) ADMINISTRATION — 5,306 hours.
(1) Organization Activities — 847 hours. This category includes organization of new local leagues; visits to local leagues by state board members, in company with National League representatives and State Organization Chairmen; correspondence with local leagues on organizational matters; and participation in an organizational conference in Chicago, Illinois. (2) Board Meetings — 1,642 hours. This category includes both time spent at such meetings and travel time. *636 (3) Finance — 457 hours. This category includes time spent at State League Budget Committee meetings; correspondence with local leagues on financial matters; the time of the State League treasurer in keeping financial records; and time used in working with Finance Committee Chairmen of the local leagues on techniques of fund raising. (4) Public Relations — 360 hours. Included in this category are the following activities: (A) State meeting of the Public Belations Committee Chairmen of the local leagues, including time spent in preparation for such meeting. (B) General correspondence with local leagues concerning public relations. (C) Preparation, publication and distribution of the State League bulletin, “The Michigan Voter.” (This activity involved 75 hours.) This bulletin set forth the voting records of Michigan Congressmen on bills in which the League was interested, discussed state legislation which the State League supported, such as revision of the State Constitution, and gave the status of legislation in which the State League was interested. (D) Preparation and placing of news releases dealing with conferences which had been held by the State League, notices to members of the State League of certain meetings, and notices of new League publications. (E) Maintaining a scrapbook containing news items dealing with activities of the Michigan State League. (5) Administrative activities of the State League president, incident to the day-to-day operation of the league — 2,000 hours.
(c) legislative activity — 76 hours. As in the situation with respect to all the leagues herein involved, this category includes only time devoted to activities which plaintiff describes as the direct influencing of legislation, such as time spent in writing to legislators, and speaking to or testifying before legislative bodies. Time spent on writing articles in any publication on Beapportionment, Children’s Services, or any National Program item is not included. The activities included are as follows: (1) Sending to local leagues copies of an initiative petition, prepared by an organization other than the State League, for the reapportionment of the State Legislature — 5 hours. The local ■ leagues were requested to obtain signatures and then to return the petitions to the State League. (2) The issuing of a *637 “Call for Action” to the local leagues urging that the question of whether to hold a constitutional convention be placed on the April ballot by state officials in order that there could be a vote on the question by the electorate— 8 hours. The League advocated the placing of the question on the ballot. (3) The issuing of a “Call for Action” on a State Fair Employment Practices Commission bill, urging that each local league write in favor of the bill to its state representative — 4 hours. (4) Testimony by a state Board member at a hearing held by a committee of the State Legislature on the Fair Employment Practices Commission bill. This involved 4 hours, not including, however, the time spent in preparing the statement. (5) Preparing for, and appearing before the State Legislative Committee on Taxation to urge the Committee to appoint a State Commission on Taxation to study the tax situation in Michigan — 18 hours. (6) Preparing and delivering to the Governor a resolution urging the appointment of a Tax Commission for the purpose of studying Michigan’s tax structure — 18 hours. (7) Preparing and sending the following letters and telegrams to state and national legislative officials or representatives — 19 hours: A. Telegram of May 19, 1948, to Senators Vandenberg and Ferguson urging them to support the extension of the Reciprocal Trade Agreements Act “with no crippling amendments as keystone of our foreign economic policy and cornerstone of our future part in International Trade Organization.” B. Letter of May 19, 1948, to Governor Sigler expressing appreciation of his proclamation of “World Trade Week in Michigan” and urging that he contact Michigan Congressmen and inform them of the importance to the State of the extension of the Reciprocal Trade Agreements Act, without crippling amendments. C. Letter of April 18, 1949, to Representative O’Brien supporting his stand on a pending housing bill. D. Letter of April 18, 1949, to Representative Engel expressing League appreciation for his work in behalf of the housing bill. E. Letter of April 19, 1949, to Governor Williams urging that he renew for the current year the proclamation issued by Governor Sigler relative to “World Trade Week.” F. Telegram of May 30, 1949, to Senator *638 Ferguson dealing with the League’s support of a bill providing for Home Rule for the District of Columbia. G. Letter of August 18, 1949, to Representative Engel expressing appreciation for his work in support of the housing bill and hope that he would continue to work for necessary-amendments to strengthen the bill. H. Letter of September 9, 1949, to Senator Ferguson commending him on his position with respect to displaced persons legislation. I. Letter of March 18, 1950, to Senator Ferguson congratulating him for supporting a Senate Resolution concerning the United Nations. J. Letter from the State Board to the State Legislature supporting a bill to reduce the hours of labor for minors. K. Letter from the State Board to the State Legislature in support of a bill to shorten the hours of work for females in manufacturing concerns.
THE ANN ARBOR LEAGUE
48. The League of Women Voters of Ann Arbor, Michigan, (hereinafter called the “Ann Arbor League”) is an integral part of the League of Women Voters of the United States and of the League of Women Voters of Michigan.
49. Article II of the Ann Arbor League’s By-Laws, entitled “Purpose and Policy” provides as follows:
Sec. 1. Pwrfose. — The purpose of the League of Women Voters of Ann Arbor shall be to promote political responsibility through informed and active participation of citizens in government.
Sec. 2. Policy. — The League of Women Voters of Ann Arbor may take action on local governmental measures and policies in the public interest in conformity with the Platform of the League of Women Voters of the United States. It shall not support or oppose any political party or candidate.
50. The composition of the Ann Arbor League’s board of directors, the League’s by-laws provisions with respect thereto, and with respect to the holding and the business of the annual meeting, are all identical with those pertaining to the Miami League, as set forth in findings 35 and 36.
51. Article IX of the By-Laws, headed “Program” provides as follows:
*639 Seo. 1. Current Agenda. — The Current Agenda shall be limited to such local governmental issues as the Annual Meeting shall choose for action.
a. The Board of Directors shall consider the recommendations sent in by voting members two months prior to the Annual Meeting and shall formulate a proposed Current Agenda.
b. The Proposed Current Agenda shall be sent to all members one month before the Annual Meeting. (N.B.. The printing of the proposed Current Agenda in the bulletin may be considered sufficient notice.)
Seo. 2. Member Action. — Members may act in the name of the League of Women Voters of the United States only when authorized to do so by the Board of Directors.
Seo. 8. Local League Action. — The League of Women Voters of Ann Arbor may act only in conformity with, or not contrary to, the position taken by the League of Women Voters of the United States as stated in the Platform.
52. (a) The program of the Ann Arbor League for the period 1948-1949 was as follows:
Study of the problems in connection with the growth of the city: annexation, Veterans Hospital, water and sewerage, schools, rezoning, and others as they may arise.
Support of changes in the City Health Department which would bring about an improvement in its services to the community.
Work towards a greater public understanding of the need for city charter revision.
Study of public services to children.
(b) The program for the period 1949-1950 was as follows:

Current Agenda

1. Support of revision of the Ann Arbor charter directed toward obtaining council-manager government. In conjunction with this we will continue our study of the properties of a good city charter and of the services and activities of our present government.
2. Support of the School Building Program. We plan to maintain a continuing interest in its development.

Platform

1. A knowledge of and continuing interest in the activities of the City Council, County Board of Supervisors and the City School Board.
*640 2. Support of changes in the City Health Department which would bring about an improvement in its services to the community.
3. Problems connected with the growth of the city and county including the functions and activities of the city and county planning commissions.
4. Improved public services to children.
5. Non-partisan elections.
53. During the period April 1, 1948, to April 1, 1950, the Ann Arbor League devoted a total of 11,722 woman hours to all of its various activities. In fashion similar to that set forth above with respect to the other leagues, plaintiff has divided all of such hours, including those of a purely housekeeping and administrative nature, into three main categories. These categories, as defined by plaintiff, and the number of hours spent on each are as follows:
(1) Organization — 2,696 hours. This category includes the following activities: (a) Membership, consisting of activities such as acquiring new members — 281 hours, (b) Fina/nee, including preparing for and conducting a drive to raise funds by solicitation of both the public and the membership — 624 hours, (c) Board of Directors Meetings — 627 hours, (d) Officers, consisting of the time devoted to organizational activities by the Ann Arbor League officers— 1,082 hours, (e) Budget Committee, consisting of the time spent by the Committee in drawing up the annual budget — 30 hours, (f) Nominating Committee, consisting of the time spent by the Committee in selecting candidates for Ann Arbor League offices — 24 hours, (g) Organization of Nonmember Discussion Groups — 12 hours, (h) By-Laws, consisting of time spent by the By-Laws Committee — 16 hours.
(2) Citizenship Education — 8,968 hours. This category includes: (a) Membership Meetings — 1,748 hours. Included is the time spent in preparing for the meetings. Daytime meetings dealt with some item on either the National, State or Local League current agenda, with the membership being addressed by a speaker on such item. The speakers were often from the University of Michigan who were recognized authorities in their fields. At the evening meetings, there were fewer outside speakers, many of the programs being conducted by League members connected with an item which *641 was under study, such, as a study group of the local league, (b) Publicity — 76 hours. This consisted of press releases containing notices of meetings; accounts of meetings and talks given thereat; and preparation and delivery of a series of 15-minute informational-type radio broadcasts, usually dealing with some subject on the local, state or national program, (c) Orientation meetings — 144 hours. These were meetings at which the League program was explained to new members, (d) Bulletin — 128 hours. This includes time in preparing and distributing the mimeographed local league “Bulletin”, which contained announcements of meetings and occasional excerpts from minutes of membérship meetings. The Bulletin also contained from time to time a “Request for Action”, such as the issue of May 1948, which urged the members “to write to Rep. Earl C. Michener asking him to urge prompt and full hearings before the House Ways and Means Committee” on H. J. Res. 335 to renew the Reciprocal Trade Agreements Act, and to “send copies to Chairman Harold Knutson of the Ways and Means Committee, who has been traditionally isolationist and high-tariff man”. Similarly the June 1949 issue urged members to “write our Congressmen” on various bills, (e) World Trade Project — 300 hours. This includes time spent by the Ann Arbor League, in conjunction with other local organizations, in conducting a telephone survey designed to interest the community in world trade. 100 members called every fourth or fifth name in the Ann Arbor telephone book and asked questions designed to stimulate thinking about increased trade between people in the United States and people in other countries, the effect of such trade upon the people in Michigan, and the effects of tariff reductions. The project was in furtherance of the item on the National Current Agenda “Promoting International Reconstruction and the Expansion of World Trade.” (f) Sale of Washtenaw Oou/nty Government Booklet — 24 hours. This book was a compilation of factual information on the structure and operation of the Washtenaw County Government. League members visited rural schools and libraries to attempt to sell the booklet to them, (g) State and National Convention — 608 hours. This includes time spent by Ann Arbor delegates in attending the State and National *642 League conventions, (b) Voters Service — 1,345 hours. This includes the following: Conducting a drive to encourage people to register to vote in the Ann Arbor school elections and in a primary election by sending out notices to persons not registered; placing posters in windows of banks and other buildings, distributing handbills, and flashing notices on screens of theaters; interviewing candidates for public office concerning local problems, and arranging for publication in local newspapers of their replies; preparation of a questionnaire for candidates which, together with the candidates’ answers, was published in the local newspapers and distributed in such places as the Ann Arbor library, the YWCA, and the YMCA. (i) Local Program — 1,599 hours. This includes: 1. Time spent by members who participated in a study group which met monthly to discuss subjects on or related to the program. 2. Time spent by members of a special “Growth of City Study Committee.” 3. Time spent by members of a special committee on Charter Study, which studied charters of other cities and compared them with Ann Arbor’s charter, and in joining with other community organizations, including the Junior Chamber of Commerce, a veterans group, and a professional women’s group, in an effort to bring to the public the advantages of modernizing the city charter. The Ann Arbor League’s function in this combined activity was to arrange for speakers to address various organizations in the community. Among other things, these speakers pointed out what they believed were the good and what were the outmoded provisions of the charter. In general, the speakers indicated the need for a change in the charter. There was no legislation relating to the city charter pending during this period. In about October 1949, it was concluded that the community was not interested in charter revision and the various organizations abandoned the activity. The Ann Arbor League did not continue this work on its own. 4. Time spent in study of the Municipal Court. 5. Time spent by a special committee on a study of the structure of the health departments in various communities and a comparison of these departments with Ann Arbor’s. This committee, after the study, recommended to the City Council *643 that the County Health Director be appointed the City Health Director in order to insure coordination between the-two. 6. Time spent by a Special Committee on a School Bond Issue, (j) State Program — 818 hours. This includes, the following: 1. Time spent by a study group on state-taxes. The group engaged in research and distributed factual information concerning the state tax structure and operation. 2. Time spent surveying the services available in Ann* Arbor for afflicted children. 3. Time spent on the study of a proposed amendment to the State Constitution which would! provide for periodic reapportionment of the State Legislature. At this time, the Ann Arbor League was supporting-the adoption of such an amendment, but there was no such, legislation pending, (k) National Program — 1,648 hours.. Included herein are: 1. Time spent by a study group on various aspects of the United Nations. This was in furtherance-of the program of the National League to strengthen the* United Nations. Also with respect to this United Nations, item, there is included time spent by a local league representative in traveling to and attending the National League Conference on the United Nations at Lake Success, New York, as* well as time spent in conducting an essay contest in the Ann. Arbor schools during United Nations Week, and in arranging radio announcements and announcements by local ministers stating that it was United Nations Week. 2. Time-spent on a study of the National Fiscal Policy. This included a study of the Federal budget, and an analysis of Federal taxes and expenditures. Also included is the time spent by a-, local league representative in traveling to and attending an-area conference of League members dealing with the Federal budget. 3. No time is included under this category for the-“World Trade” item on the National League’s Current-Agenda. As set forth above, the work done by the Ann Arbor League on its “World Trade Project” is listed by plaintiff under (e) above. (1) Speakers Bureau — 57 hours.. This includes the time necessary to write letters to various-organizations in the community, explaining the subjects on. which speakers were available, the arranging for 21 speakers, and the time to make the speeches. The speeches were on *644 subjects appearing on the Local, State or National League programs, (m) Publications Distribution — 24 hours. This includes the time of the Ann Arbor League Publications Committee Chairman, whose duty it was to bring the National League publications to each meeting so that members might purchase them, (n) Unit Discussion Groups — 449 hours. These were small study groups, including both members and nonmembers, who met to discuss items on the National, State and Local League programs. The topics of discussion included local health services, the United Nations, and the State reapportionment issue.
(3) Influencing Legislation — 58 hours. This category is restricted to the following activities: (a) All Ann Arbor League correspondence during the period herein involved with members of a local, state or national legislative body or public official. These consisted of the following: 1. Letter to the Ann Arbor City Council urging that more voting machines be set up and that careful consideration be given to appointments to the positions of municipal judge and city treasurer. 2. A letter to the Ann Arbor City Council recommending that the county health director be appointed the city health director in order to facilitate coordination between the two health departments. 3. Letters to the local congressional representatives in response to calls for action from the National League in support of: a. Home Rule for the District of Columbia; b. Federal Aid to Education; c. The Taft-Ellender-Wagner Housing Bill; d. The Removal of the Federal Tax on Margarine; e. Extension of the Reciprocal Trade Agreements Act; f. Amending the Displaced Persons Act to allow others than those in displaced persons camps to be permitted to enter the United States on the same terms as those in the camps, (b) Making speeches and distributing literature which favored state constitutional revision, (c) Telephoning members and asking them to write their representatives concerning their position on the Displaced Persons Bill and on Home Rule for the District of Columbia.
54. The Ann Arbor League has never contributed to or been affiliated with a political party, nor has it ever endorsed, approved or opposed any candidate for public office.
*645 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover and the petition is therefore dismissed.

 The phrase “and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation” first appeared in the Revenue Act of 1934. The bill which eventually evolved as that revenue act contained no such limitation as first introduced and passed by the House. It was added by the committee in the Senate being first placed in the section, 23(o)(2), dealing with deductions allowed individuals on contributions to charitable organizations. It was then placed in the estate tax section, where it now appears. The purpose in so doing was stated in the Senate Report as follows:
“This change is necessary to carry out the policy adopted in section 23 (o) (2).” [Senate Report 558, p. 46, 73d Cong., 2d Sess.]
What was the policy intended by the placing of the limitation In section 23(o) (2)i? The committee reports shed no light, but the discussion on the Senate floor when the amendment to the House bill was brought up indicates that organizations such as plaintiff were not to be removed from exemption. This discussion lends support to our belief that organizations such as those which act in the general interest of the public, for example those organizations urging adoption of the child labor amendment to which specific mention is made in the discussion, as distinguished from those groups which advance the personal interest of the contributor, are not intended to be denied exemption. Cong. Ree. Vol. 78, Part 6, pp. 5861 and 5959.

 Even if tbe first four of the above items are eliminated, leaving the three categories of program, voters service, and legislative activities, the percentage •would be as follows :

A “workshop” is a meeting at which persons receive training to become discussion leaders. National Board members, or outside speakers and experts, may come to the workshop to participate in the training. The discussion leaders then go to local league meetings and lead the discussion on the particular subject matter.

 In a broad category such as the united Nations item, upon which the League had taken a position in the past, and was currently taking a position on specific measures relating thereto, it would, of course, be difficult to make an accurate delineation between hours spent only on study, research, and providing educational information, and hours spent on what could be considered to be legislative activity even if the definition thereof be considered to be broader than that adopted by plaintiff, since the Information and data upon which the legislative activity is taken is based upon the same study and research hours as those upon which the providing of purely educational information is based.